## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-00619-LTB-MJW

Philip W. Wyers, a Colorado resident, and
Wyers Products Group, Inc., a Colorado corporation,

      Plaintiffs,

v.

Master Lock Company, Inc., a Delaware corporation

      Defendant.
      Defendant.

_____

## MARKMAN BRIEF BY PHILIP W. WYERS AND WYERS PRODUCTS GROUP, INC. FOR THE CONSTRUCTION OF THE CLAIMS OF U.S. PATENT NO. 6,055,832, U.S. PATENT NO. 6,672,115, U.S. PATENT NO. 7,165,426 AND  U.S. PATENT NO. 7,225,649

**COME NOW**, Plaintiffs, Philip W. Wyers and Wyers Products Group, Inc. (jointly "Wyers") by and through its counsel of record, and submits ther Markman Brief By Great Divider Golf for the Construction of the Claims of U.S. Patent No. 6,055,832, U.S. Patent No. 6,672,115, U.S. Patent No. 7,165,426 and U.S. Patent No. 7,225,649 pursuant to *Markman v. Westfiew Instruments, Inc.,* 52 F.3d. 967, 34 USPQ2d 1321 (Fed. Cir. 1995).

## I.      INTRODUCTION

Philip W. Wyers is a prolific inventor in a variety of fields, but most predominantly in the field of locks and securing systems, especially for the towing industry. Over ten years ago, he formed Wyers Products Group, Inc. to market numerous

products in this field.  Wyers Products Group is also known as Trimax, and its locks are known as Trimax® locks.  Wyers Products Group has grown steadily over the years as a result of Mr. Wyers' patented inventions, which are licensed to his company.

Four of those patents are at issue in this case, as set forth in the following table:

| Patent Number | Filed | Published | Issued |
|---|---|---|---|
| 6,055,832 | Sept. 15, 1998 claiming benefit of provisional filed Sept. 16, 1997 | N/A | May 2, 2000 |
| 6,672,115 | April 24, 2000 | June 20, 2002 | January 6, 2004 |
| 7,165,426 | Jan. 6, 2004 claiming benefit of parent application ('115 Patent) filed April 24, 2000 | July 22, 2004 | January 23, 2007 |
| 7,225,649 | Feb. 5, 2004 claiming benefit of provisional filed Feb. 7, 2003 | Jan. 6, 2005 | June 5, 2007 |

This is not the first time Wyers has been called upon to enforce their patent rights against the defendant, Master Lock Company, Inc. ("Master Lock"). In 2001, Wyers sued Master Lock in this district (Civil Action No.: 01-B-2257 (MJW)) for infringement of U.S. Patent No. 6,055,832, one of the patents-in-suit in this current litigation.  The earlier litigation resulted in settlement with a license to Master Lock, but Master Lock contends that it current products are not subject to this license.

## II.    FACTUAL BACKGROUND

### A.    U.S. Patent No. 6,055,832 (the '832 Patent)

The '832 patent is summarized as:

2

A locking device includes a shackle member and a key operable locking head that may be fastened onto a latch portion of the shackle member. The locking head has a housing and a rotatable retainer and a lock core in the interior of the housing. The lock core is mechanically coupled to the retainer, and both the retainer and the lock core are axially oriented with respect to an axial opening in the housing. The latch portion is axially insertable through the axial opening when the lock core is in an unlocked state and has a latch head which becomes fastened by the locking head when the retainer is rotated by the lock core into a locked state. A seal is supported by the housing proximately to the axial opening and acts to seal against a seal surface on the latch portion. The shackle member can be a linear portion with a stop portion, such as a knob, or alternatively, a cable member. The latch portion preferably has both a first profile that engages the axial opening to prevent relative rotation of the shackle member and the locking head and a second profile that extends through an aperture in the retainer. The first and second profiles are geometrically similar. A limit stop prevents rotation of the retainer through more tan a selected arc.  **Exhibit 1, Abstract**  A representative device is depicted at Figures 1, 2 and 11.

**B.      U.S. Patent No. 6,672,115 (the '115 Patent)**

The '115 patent is summarized as:

A locking device includes a shackle member having a shank and a latch portion at one end and a stop at the other end. A locking head mounts in a locked state on the latch portion but is removable. The sleeve and the shank together define a size conversion structure for the shackle. When the sleeve is on the shank, the shackle has one operative thickness to closely fit one size aperture, but when the sleeve is removed, the shackle has

another, smaller operative thickness to fit a smaller aperture. A retaining member may be employed to resist removal of the sleeve. Two or more sleeves may be used to fit more than two apertures. These can be separately mountable onto the shank or may be nested on the shank, one inside the other. **Exhibit 2, Abstract**  A representative device is readily depicted at Figures 1, 2, 11 and 12.

**C.      U.S. Patent No. 7,165,426 (the '426 Patent)**

The '426 patent is summarized as:

A method utilizes a locking device that includes a shackle member having a shank with a latch portion and a stop at opposite ends. A locking head mounts in a locked state on the latch portion but is removable. The sleeve and the shank together define a size conversion structure for the shackle. When the sleeve is on the shank, the shackle has one operative thickness to closely fit size aperture, but when the sleeve is removed, the shackle has another, smaller operative thickness to fit a smaller aperture. A retaining member may be employed to resist removal of the sleeve. Two or more sleeves may be used to fit more than two apertures. These can be separately mountable onto the shank or may be nested on the shank, one inside of the other. **Exhibit 3, Abstract**  The '426 Patent claims methods of using a locking device such as that described in the '115 Patent.

**D.      U.S. Patent No. 7,225,649 (the '649 Patent)**

The '649 patent is summarized as:

A locking device includes a shackle member that includes an elongated shank portion, a stop portion on a first end and a latch portion on a second end.  A locking head includes a locking mechanism that has an entryway to receive the latch portion and is movable between a locked state to retain the latch portion and a unlock state to release

the latch portion.    A head cover includes a  cover portion that engages the locking head and a flange portion that extends inwardly to define an opening to receive the latch portion therethrough.  A seal structure is associated with the inner edge of the flange and sealably engages the outer surface margin of the latch portion.   The seal structure may be a margin of the flange portion or a separate O-ring.  The lock may be constructed as a lockable hitch pin.  **Exhibit 4, Abstract**  A representative device is readily depicted at Figures 1 and 6.

### III.    CLAIM CONSTRUCTION PRINCIPLES

Pursuant to 35 U.S.C. 271(a), "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."

The claims of a patent, much like the metes and bounds of a real estate deed, define the technology that the patent owner may exclude others from making, using, or selling. To determine whether a patent is infringed, a two-step analysis is required by the courts.  First, the patented invention, as set forth in the words of the patent claims, must be clearly understood. This is a question of claim interpretation and it is determined by the court as a matter of law. See, *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 116 S.Ct. 1384, 134 L. Ed. 2d 577 (1996). The meaning attributed to the terms recited in a claim constitutes an interpretation of the claim and is sometimes referred to as the "scope" of the claim. Only after the scope of a claim is determined can a comparison be made to the accused or proposed device. *Markman v Westview, Instruments,* Inc., 52 F. 3d 967, 979, 34 U.S.P.Q. 2d at 1329 (Fed. Cir. 1995) *(en banc), aff'd*, 116 S. Ct. 1384 (1996).

Under the second step of the analysis, the trier of fact must determine whether the claims, properly interpreted, embrace the accused or proposed device (or process) within their scope, e.g., whether the device or process is a fair example of the invention recited in the claims. See, *Hormone Research Foundation v Genentech, Inc.,* 904 F. 2d 1558, 1562, 15 U.S.P.Q. 2d 1039, 1042 (Fed Cir. 1990).   Application of a properly construed claim to an accused device is a question of fact. *Ekchian v. Home Depot, Inc.,* 104 F. 3d 1299, 1302 (Fed. Cir. 1997).

In determining the proper construction of a claim, the court has numerous sources that it may properly utilize for guidance. The first, and most obvious tool to interpret claim terms, is the language of the claims themselves. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F. 3d 1576, 1582 (Fed. Cir. 1996). The ordinary and customary meaning of a term is the meaning that would be given by a person of ordinary skill in the art of the invention at the time of the invention, i.e., as of the effective filing date of the patent application. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).

Claims are not to be interpreted in a vacuum, but must be read in light of the specification. *Markman, supra.* This is because the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim, but in context of the entire patent, including the specification. *Phillips, supra,* 415 F.3d at 1313. Similarly, the drawings included in the specification may aid in the interpretation of a claim. *Uniroyal,.Inc. v. Rudkin-Wiley Corp.,* 837 F. 2d.1044, 1056, 5 U.S.P.Q. 2d 1434, 1443 (Fed. Cir. 1998), *cert. denied,* 488 U.S. 825 (1988) (patent drawings referred to in order to interpret the meaning of the limitation "gap" used in a claim).

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips, supra,* 415 F.3d at 1314. Reference to the specification is important in another respect. Words in a claim may be designated by the author of a patent application to mean something other than what would be encountered in ordinary use. In other words, the inventor is allowed "to be his own lexicographer." *Vitronics, supra,* 90 F.3d at 1582.

Although claims are always construed in light of the specification, that does not mean that the claims incorporate all disclosures in the specification. *Constant v. Advanced Micro Devices, Inc.,* 848 F. 2d 1560, 1571, 7 U.S.P.Q. 2d 1057, 1064 (Fed. Cir. 1988). Likewise, what is patented is not restricted to the examples set forth in the specification, but is defined by the words in the claims. *Modine Mfg. Co. v. U.S. Intern. Trade Comm'n,* 75 F.3d 1545,1551 (Fed. Cir. 1996).

Another important tool that should be considered in interpreting the meaning of the claims is the prosecution history of the patent. The prosecution history contains the complete record of all the proceedings before the PTO, including the prior art. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips, supra* 415 F.3d at 1317. The prosecution history limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance. *Vitronics, supra*, 90 F.3d at 1582-83.

District Courts are also authorized to rely on extrinsic evidence in claim construction. *Phillips, supra at* 415 F.3d at 1317. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman,* 52 F.3d at 980. But extrinsic evidence is of less significance than the intrinsic record. *C.R. Bard, Inc. v. U.S. Surgical Corp.,* 388 F.3d 858,862 (Fed. Cir. 2004).

The use of dictionaries, in particular, provide the grist for much debate over claim interpretation.. On one hand, they may provide the definition of words in the abstract rather than the meaning of claim terms as they appear in context of the patent. *Phillips, supra* 415 F.3d at 1321. Nonetheless, "[d]ictionaries and comparable sources are often useful to assist in understanding the commonly understood meaning of words." *Philips, supra* 415 F.3d at 1322. Judges are free to use dictionaries:

> at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does [not] contradict any definition found in or ascertained by a reading of the patent documents.

*Vitronics,* 90 F.3d at 1584, n.6.

## IV.   CLAIM TERMS TO BE CONSTRUED AND PROPOSED CONSTRUCTION

### A.   '832 PATENT

Wyers suggests that the highlighted terms set forth in Claims 17 and 18 of the '832 Patent, reproduced below, be construed as a matter of law.

17.   A locking device, comprising:

(a)   **a key operable locking head** movable between a locked state and an unlocked state and including a housing having an opening and an interior, a retainer and a lock core disposed in said housing, said lock core mechanically coupled to said retainer and having a keyway adapted to receive a key whereby

rotation of the key acts to rotate said lock core thereby moving said retainer to define the locked state and the unlocked state, said locking head including **a seal disposed proximately to the opening in surrounding relation thereto**; and

(b)  a shackle member including a latch portion configured for insertion into the locking head through the opening to define a mated state and configured to engage said locking head, said latch portion including a latch head operative to mate with said retainer when said locking head is in the unlocked state yet configured to prevent withdrawal from said locking head when said locking head is moved to the locked state whereby said latch portion is captured by said locking head to define a fastened state, **said latch portion including a seal surface, said seal engaging said seal surface when said locking head is in the fastened state** thereby to prevent ingress of unwanted substances through the opening and into the interior of said housing.

18.     A locking device according to claim 17 wherein **said shackle member includes a linear portion that has an enlarged knob disposed at a first end thereof with said latch portion disposed at a second end thereof opposite the first end**.

## 1.     <u>A key operable locking head</u>

The specification of the '832 Patent describes the locking device of the invention to include a "shackle member 20 and a key operable locking head 40".  **Exhibit 1, 5:39-40**[1]  The locking head is depicted in Figures 1 and 2 of the patent and is  described in greater detail to include a "housing 42" having an "interior 60" and an "opening 62".  **Exhibit 1, 6:22-27**  The housing contains the locking components, including the "lock core 70".  **Exhibit 1, 6:6-49.**  The lock core is of a standard construction known in the art and is actuated by a key to be moved between a locked state and an unlocked state.  **Exhibit 1, 6:35-40**

In the background section of the '832 Patent, locking heads are also described in reference to the previous patents, such as U.S. Patent No. 4,576,021 to Holden **Exhibit 5** may be fastened to the shackle member when in a locked state and which may be

---

[1] This format is used to cite to a patent, here with "**5**" referring to the column number and "**39-40**" referring to the lines in that column.

disconnected from the shackle member when in an unlocked state. The locking heads in such devices, as illustrated in the '832 Patent and the '021 Patent, fasten to the shackle member when locked and are disconnected from the shackle member when unlocked.

Wyers request that "key operable locking head" be defined as:

> *a piece which may be placed in a locked state or unlocked state by means of a key and which may be fastened to a shackle member when in a locked state and which may be disconnected from the shackle member when in an unlocked state*

**2.      A seal disposed proximately to the opening in surrounding relation thereto**

One component of the locking head of the '832 Patent is identified as a "seal" which "prevents ingress of unwanted substances through the axial opening and into the interior of the housing." **Exhibit 1, 3:20-26** Thus, the '832 Patent provides the meaning of the term "seal". This meaning, of course, is consistent with the generally accepted definition of a "seal" in mechanical systems, namely, "a device that joins two systems or elements in such a way as to prevent leakage." **Exhibit 6**

The plain meaning of "proximate" is "very near or next, as in space, time or order." **Exhibit 6**

The plain meaning of "surround" is "to extend on all sides of simultaneously; encircle." **Exhibit 6**

Wyers request that "a seal disposed proximately to the opening in surrounding relation thereto" be defined as:

> *an element that acts to prevent passage of unwanted materials into the interior of the housing is located very near or next to the opening in the housing and extends around that opening*

**3.      Said latch portion including a seal surface, said seal engaging said seal surface when said locking head is in the fastened state**

The exemplary embodiment of the seal in the '832 Patent is an O-ring 66 that "engages seat 128 of seal surface 126" when "latch portion 22 is an in [sic "in an"] engaged state with locking head 40." **Exhibit 1, 7:60-8:3**  As is shown in the figures, and especially in Figures 10a and 10b of the '832 Patent, the engagement is contact area of the O-ring and the seal surface including this seat.  As noted above, the contact area must be located very near near or next to the opening in the housing of the locking head.

Wyers request that "said latch portion including a seal surface, said seal engaging said seal surface when said locking head is in the fastened state" be defined as:

> *Said latch portion including a surface area contacted by the seal when in the fastened state*

**4.   Said shackle member includes a linear portion that has an enlarged knob disposed at a first end thereof with said latch portion disposed at a second end thereof opposite the first end**

Claim 18 of the '832 patent adds further refinement to the meaning of the shackle member.  Here, the shackle member is recited to include "a linear portion that has an enlarged knob disposed at a first end thereof with said latch portion disposed at a second end thereof opposite the first end". **Exhibit 1, 11:57-61** Wyers suggest the plain meaning of this phrase be adopted.

The word "linear" simply means "of, relating to, or resembling a line, straight." **Exhibit 6**  "Enlarge" means "to make larger" so that "enlarged" simply means "made larger". **Exhibit 6** Therefore, a linear portion that has an enlarged knob disposed at a first end is a straight portion having a portion made larger at one end.  The latch portion is then located at the other end of the straight portion.  This is again is total correspondence with the first exemplary embodiment of the '832 Patent.  **Exhibit 1, Figures 3 and 4; Exhibit 1, 5:51-63**

Wyers request that "said shackle member includes a linear portion that has an enlarged knob disposed at a first end thereof with said latch portion disposed at a second end thereof opposite the first end" be defined as:

> *Said shackle member includes a straight portion with a portion of larger dimension at one end with the latch portion being at the other end*

## B.   THE '115 PATENT

The specification of the '115 Patent describes a locking device with a shank that is convertible in order to fit differently sized apertures.   As is known in the towing industry, there are a number of different size hitchbar/hitch receiver combinations with different sized apertures.  **Exhibit 2, 2:20-29**   The '115 Patent addresses this situation by providing a hitch receiver lock that may be changed to accommodate differently sized aperture combinations. **Exhibit 2, Figures 11 and 12**

The specification of the '115 Patent incorporates the '832 Patent by reference. **Exhibit 2, 1:5-9**  While some of the relevant terms for the claims of the '115 Patent are discussed above, and are incorporated herein, Wyers suggest that the highlighted and italicized terms set forth in Claims 1 and 19 of the '115 Patent, reproduced below, be construed as a matter of law.

1.   A locking device adapted for insertion into first and second apertures having different sizes, comprising:

(a)   **a shackle member having a shank terminating in first and second ends**;

(b)   **a locking head movable between a locked state and an unlocked state**;

(c)   a latch portion disposed at the first end of said shank and configured to selectively engage said locking head;

(d)      **a stop portion disposed at the second end of said shank**;

(e)      **a sleeve removably disposed and carried on said shank** when in an engaged position such that said shank and said sleeve together define a size conversion structure for said shackle, said size conversion structure having one operative thickness dimension for insertion into one of said first and second apertures when said sleeve is in the engaged position and another operative thickness dimension smaller than said one operative thickness dimension for insertion into another of said first and second apertures when said sleeve is removed from said shank; and

(f)      **a retaining member independent of said locking head** for releasably securing said sleeve on said shank.

19.    A locking device adapted for alternative close-fitted insertion within a first aperture having a first diameter and a second aperture having a second diameter larger than the first diameter, comprising:

(A)      a shackle member including

(1)      a cylindrical shank having a shank diameter of a first selected size for mated engagement with the first aperture such that said shank may be inserted into and removed from the first aperture

(2)      a latch portion located at a first end portion of said shank and

(3)      a stop portion located at a second end portion of said shank;

(B)      a locking head configured to selectively engage said latch portion to define a mounted state and movable between a locked state wherein said locking head is lockably secured to said shackle and an unlocked state wherein said locking head is removable from said shackle;

(C)      a sleeve formed as a cylindrical shell having an inner diameter sized and adapted for **close-fitted yet removable telescopic engagement on said shank** and a larger, outer diameter of a selected size for close-fitted, mated engagement with the second aperture, said sleeve operative when received on said shank such that said shank and sleeve may be inserted together into and together removed from the second aperture.

1.      <u>**A shackle member having a shank terminating in first and second ends**</u>

Here, again, the exemplary locking device includes a "shackle member 12 and a key operable locking head 14". **Exhibit 2, 4:54-55**  The exemplary locking device is a

locking hitch receiver pin adapted to extend through the apertures of a hitch receiver and a hitch bar, of standard construction, **Exhibit 2, 4:58-62**, such as shown in Figure 1 of the patent.

The "shackle member" is described to include "an elongated linear portion that is in the form of an elongated shank 30." **Exhibit 2, 4:67-5:2**  Therefore, the '115 Patent defines what is meant by a "shank", namely, an "elongated linear portion". This is in correspondence to the generally accepted meaning of shank as being "a leg or leglike art." **Exhibit 6**  This is further supported by the Figures of the '115 Patent, e.g., Figures 1, 3 and 4

Unlike claim 1 of the '832 Patent, the recitation of shackle member in claim 1 of the '115 Patent includes the structure of such a shank. Therefore, Wyers request that "a shackle member having a shank terminating in first and second ends" for purposes of the '115 Patent be defined as:

> *a piece that has an elongated linear portion that may fit through an aperture with the linear portion part having opposite ends*

**2.   A locking head movable between a locked state and an unlocked state**

This recitation is similar to the "key operable locking head" in the '832 Patent, but eliminates the recitation of "key operable". Therefore, the construction should be similar, without the requirement of operation by a key. Accordingly, Wyers request that "a locking head movable between a locked state and an unlocked state" be defined as:

> *a piece which may be placed in a locked state or unlocked state and which may be fastened to a shackle member when in a locked state and which may be disconnected from the shackle member when in an unlocked state*

**3.   A stop portion disposed at the second end of said shank**

It is necessary to prevent the shackle member, when inserted into an aperture pair, to be prevented from passing completely through the apertures.  Thus, as described in the '115 Patent, a "latch portion 16 is disposed at a first end of shank 30 with a stop portion 32 being disposed at a second end of shank 30 opposite latch portion 16."  **Exhibit 2, 5:2-4**   Importantly, the "stop portion 32 may be of any desired or known shape or configuration …"  **Exhibit 2, 5:5-8**

Wyers request that "a stop portion disposed at the second end of said shank" be defined as:

> *a structure at a second end of the shank that acts to prevent movement of the shank completely through the aperture*

4. **A sleeve removably disposed and carried on said shank**

Wyers suggest that this phrase may be construed according to its plain meaning. A "sleeve" is defined as "apart of a garment that covers all or part of an arm".  **Exhibit 6** The specification in the '115 Patent supports this definition where it states that "sleeve 52 may be in the form of a metal tube sized and shaped to slidingly fit over the shank 30."  **Exhibit 2, 6:5-7**

"Removable" simply means "that can be removed", that is, taken off.  **Exhibit __**

Wyers request that "a sleeve removably disposed and carried on said shank" be defined as:

> *a piece that extends around the shank for at least as portion of its length and that is capable of being taken on and off of the shank*

5. **A retaining member independent of said locking head**

Wyers suggest that this phrase may be construed according to its plain meaning. "Retain" means "to keep or hold in a particular place, condition, or position."  **Exhibit 6**

"Independent" means "not dependent of or affiliated with a larger or controlling entity."

**Exhibit 6**  Wyers request that "a retaining member independent of said locking head" be defined as:

> *a structure or piece, not located on the locking head, that assists in keeping another piece in place, in this case, the sleeve on the shank*

## C.   THE '426 PATENT

Wyers suggest that the terms in the '426 Patent are to be construed the same as those in the '115 Patent, since the '426 Patent is a division of the '115 Patent. In addition to those set forth above, Wyers suggests that a term found in claim 1 of the '426 Patent, reproduced below, be construed.

1.      In a locking device having a locking head movable between a locked and an unlocked state, a shackle member including a linear shank having an outer surrounding surface, first and second end portions and a length and a thickness, said shackle member including a latch portion disposed at the shank first end portion and configured to engage said locking head, and a stop member disposed at the shank second end portion, a method for varying the diameter of the linear shank to adapt the locking device to variable sized apertures in components to be locked with said device, said method comprising the steps of:

(a)      providing a sleeve with an inner diameter sized to closely fit over said shank in an engaged position with said sleeve having an inner surrounding surface and a sleeve length sufficient to extend over a majority of the length of said shank when in the engaged position with the inner surrounding surface of said sleeve **in substantially confronting relation** with the outer surrounding surface of said shank over substantially the length of said sleeve thereby to achieve a close-fitted mated engagement with said shank;

(b)      in the alternative, either

(i)      telescopically engaging said sleeve onto said shank and thereafter positioning said shank and sleeve together within one sized aperture or

(ii)      positioning said shank without said sleeve being engaged thereon within another sized aperture; and

(c)      thereafter engaging said locking head with said latch portion.

1.     **In substantially confronting relation**

Other than those terms defined with respect to the '115 Patent, Wyers suggest that only this phrase needs construction, and that it should be construed according to its plain meaning.  "Confront" means "bring face to face with."

Wyers request that "in substantially confronting relation" be defined as:

> *for the most part in a face-to-face relation*

D.     **THE '649 PATENT**

1.   A locking device, comprising:

(A)     a shackle member including (1) an elongated shank portion having a longitudinally extending axis, (2) a stop portion at a first end of said shank portion, and (3) a latch portion at a second end of said shank portion, said shank portion having an outer surface margin adjacent to said latch portion;

(B) a locking head including **a casing having** a surrounding sidewall surface and **a generally flat transverse inner head face** with an entryway sized and adapted to mate with said latch portion in a longitudinal axial direction and a locking mechanism disposed in said casing, said locking mechanism being movable between (1) a locked state to lockably retain said latch portion in said locking head when said latch portion is in an engaged state and (2) an unlocked state to release said latch portion therefrom; and

(C)     a  head cover including

> (1)     a cover portion operative to engage the sidewall surface of said casing in surrounding relation thereto and extending therealong in the longitudinal axial direction so as to be secured thereto**,** and

> (2)     a flexible, resilient **flange portion extending inwardly from said cover portion to define an opening having a surrounding flange edge that defines a seal structure,** the opening being sized such that said latch portion may be inserted into and removed from said locking head through the opening with s**aid seal structure operative when said latch portion is in the engaged state to sealably engage the outer surface margin of said shank portion**.

33.     A locking hitch pin adapted to secure at least two members together, comprising:

(A)     a shackle member including

    (1)     an elongated cylindrical shank portion,

    (2)     a stop portion located at a first end of said shank portion and formed as either a cylinder or a frustum and oriented coaxially with said shank portion so as to have a peripheral stop portion surface, a transversely oriented inner stop face adjacent to said shank portion and a transversely oriented outer stop face opposite said inner stop face, and

    (3)     a latch portion at a second end of said shank portion, said shank portion having an outer surface margin adjacent to said latch portion;

(B)     a locking head formed either as **a cylinder or a frustum** adapted to engage said shank to define an engaged state, said locking head having a peripheral head surface, a transversely oriented inner head face adjacent to said shank portion with an entryway sized and adapted to mate with said latch portion such that said locking head is coaxial with said shank when in the engaged state and a transversely oriented outer head face opposite said inner head face, said locking head including a locking mechanism disposed therein that is movable between

    (1)     a locked state to lockably retain said latch portion in said locking head when said latch portion is in the engaged state with said locking head and

    (2)     an unlocked state to release said latch portion from said locking mechanism; and

(C)     a head cover including

    (1)     **a skirt operative to extend around and mechanically engage at least some of the peripheral head surface so as to engage said locking head,**

    (2)     a first flange extending inwardly from said skirt portion alongside and in confronting relationship with the inner head face and having an opening forming a surrounding flange edge, the opening being sized such that said latch portion may be inserted into and removed from said locking head through the opening, and

    (3)     a seal structure associated with the edge of said first flange, said seal structure operative when said latch portion is in the

engaged state to seal against the outer surface margin of said shank portion.

1.    **A casing … having a generally flat transverse inner head face**

Although "casing" does not appear in the specification, it is clear that it refers to the housing of the locking head since claim 1 states that this element has the "entryway sized and adapted to mate with said latch portion."   Therefore, "casing" should be construed similarly to "housing" as set forth above. **Exhibit 4, 6:13-15**

"Transverse" should be construed according to its generally accepted meaning, which is "situated or lying across, crosswise". **Exhibit 6**  In the specification, it is clear that the reference axis for the crosswise orientation is axis "L". **Exhibit 2, Figure 1**

Wyers request that "a casing … having a generally flat transverse inner head face" be defined as:

> *a housing … having a generally flat inner face that is oriented crosswise to the longitudinal axis of the shackle shank*

2.    **a flexible, resilient flange portion extending inwardly from said cover portion to define an opening**

The specification of the '649 Patent states that "flange portion 84 extends inwardly for cover portion or skirt 82 to define an opening 86 being having a surrounding flange edge 88." **Exhibit 4, 6:53-55**   The plain meaning of "resilient" is "capable of returning to its original shape or position." **Exhibit 6**

Wyers request that "a flexible, resilient flange portion extending inwardly from said cover portion to define an opening" be defined as:

> *a flexible portion projecting inwardly for  the cover portion to fine an opening for the latch portion with this portion being capable of returning to its original shape or position*

3.    **a skirt operative to extend around and mechanically engage at least some of the peripheral head surface so as to engage said locking head**

The specification of the '649 Patent states that "the first cover portion is in the form of a skirt 82 that substantially encases locking head 40, although it should be appreciated that it is not essential for this invention for skirt 82 to encase locking head 40 … ."   **Exhibit 4, 6:47-51**   Instead, "it is only necessary that head cover 80 engage locking head 40 sufficiently to be retainedx thereon." **Exhibit 4, 6:51-49-52**

Wyers request that "a skirt operative to extend around and mechanically engage at least some of the peripheral head surface so as to engage said locking head" " be defined as:

> *a portion that extends around the outer surface of the locking head to be retained on the locking head*

## V.    CONCLUSION

Wyers respectfully request that the Court construe the claims of U.S. Patent No.6,595,357 in accordance with the definitions of the terms set forth above, for the reasons stated therein.  This construction employs the plain meaning of the claim terms derived from the specification.

Respectfully submitted,

Dated this 6th day of November, 2007

s/Timothy J. Martin
*Timothy J. Martin*
TIMOTHY J. MARTIN, P.C.
9250 W. 5th Avenue, Suite 200
Lakewood, Colorado 80226
Telephone: (303) 232-3388
Fax: (303) 232-3288
tim@tjmlaw.com
Attorney for Plaintiffs, Wyers and Wyers Products Group, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that upon this 6th  day of November, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following counsel of record:

Jonathan H. Margolies
Joseph T. Miotke
MICHAEL BEST & FRIEDRICH LLP
100 East Wisconsin Avenue, Suite 3300
Milwaukee, Wisconsin 53202-4108
jhmargolies@michaelbest.com

Christopher P. Beall
***Faegre & Benson LLP***
3200 Wells Fargo Center
1700 Lincoln Street
Denver, Colorado  80203
cbeall@faigre.com; treed@faegre.com