IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No. 06-cv-00619-LTB

PHILIP W. WYERS, a Colorado resident, and,
WYERS PRODUCTS GROUP, INC., a Colorado corporation,

      Plaintiff,

v.

MASTER LOCK COMPANY, a Delaware corporation,

      Defendant.

_____

# ORDER

_____

      In this patent infringement case, Plaintiffs, Philip W. Wyers and Wyers Products Group,

Inc., assert that Defendant, Master Lock Company, infringed upon four of Plaintiffs' patents: U.S.

Patent Nos. 6,055,832 (the "'832 patent"); 6,672,115 (the "'115 patent"); 7,165,426 (the "'426

patent"); and 7,225,649 (the "'649 patent").  The '832 patent covers a barbell-shaped lock

intended for locking a trailer hitch onto a motor vehicle with a seal mounted within the locking

end of the barbell that prevents the ingress of dirt or other matter into the lock.  The '115 patent

covers a similar lock with a removable sleeve on the shank so as to allow the lock to be used to

lock objects with various sized apertures.  The '426 patent covers a method for providing a lock

with a removable sleeve on the shank.  The '649 patent covers a lock similar to that covered by

the '832 patent, but with a sealing cover attached to the outside of the locking head.

      The matter is now before me on the parties' cross-memorandums in support of their

proposed constructions of ostensibly disputed claim terms in the '832, '115, '426, and '649

patents.  I note, however, that the papers do not make entirely clear which claim terms are

actually in dispute. Indeed, the lack of common terms among the parties' brief suggests the parties have implicitly stipulated to most of the "disputed" terms' meaning. From my experience, I would expect seasoned patent counsel to have prepared a joint claims chart delineating the agreed claim terms to be construed. In the absence of same, I glean from the parties' briefs that at least those claim terms discussed in this order—and underlined for emphasis—must be construed.

## I.  PRINCIPLES OF CLAIM CONSTRUCTION

Patent infringement cases require a two-step analysis. *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1365 (Fed. Cir. 2002); *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed. Cir. 1999). The first step—at issue here—requires me to determine as a matter of law the scope and meaning of disputed claim terms which define the extent of the patent grant. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979–81 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370 (1996). Only after the scope of a claim is determined can a comparison be made to the allegedly infringing product. *Id*. at 979.

When interpreting a claim, I first look to the words of the claims themselves. *See Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The words in a claim are generally given their ordinary and customary meaning. *See id.* Ordinary and customary meaning of a claim term is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005). The inquiry is an objective one. *Innova/Pure Water v. Safari Water Filtration Sys.*, *Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).

Claim terms are not to be interpreted in a vacuum, however, but must be read in light of the specification. *Markman*, *supra*, 52 F.3d at 979. "Usually, it is dispositive; it is the single best

guide to the meaning of a disputed term." *Vitronics*, *supra*, 90 F.3d at 1582. This is so because "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, *supra*, 415 F.3d at 1313.

In many cases, the ordinary meaning of claim language as understood by a person of ordinary skill in the art may be readily apparent, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words. *See id.* at 1314. In such circumstances, general purpose dictionaries may be helpful. *Id.* In other cases, however, determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art. *Id.* Accordingly, in such circumstances I look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Innova*, *supra*, 381 F.3d at 1116. Such sources include "the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* Similarly, the drawings in the specification may aid in the determination of a claim. *See Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1076 (Fed. Cir. 2005).

Although words in a claim are generally given their ordinary and customary meaning, in certain cases a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning. *See Vitronics*, *supra*, 90 F.3d at 1582. Thus, it is necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. *Id.* The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication. *Id.* If the

special definition of the term is clearly stated in the patent specification, such a definition will rule

over the ordinary and custom meaning of a term.  *See id.*

      In assessing the correct scope and meaning of disputed claim terms, I am first to look at

the intrinsic evidence of record: the patent itself, including the claims, the specification and, if

relevant and in evidence, the prosecution history.  *Interactive Gift Exp., Inc. v. Compuserve Inc.,*

256 F.3d 1323, 1331 (Fed. Cir. 2001); *Vitronics*, *supra*, 90 F.3d at 1582 ("intrinsic evidence is

the most significant source of the legally operative meaning of disputed claim language").  If the

meaning of the claim limitations is apparent from the totality of the intrinsic evidence, then the

claim has been construed.  *Phillips*, *supra*, 415 F.3d at 1316.  If, however, a claim limitation is

still not clear, I may look to extrinsic evidence to help resolve the lack of clarity.  *Id*. at 1317.

Extrinsic evidence "consists of all evidence external to the patent and prosecution history,

including expert and inventor testimony, dictionaries, and learned treatises."  *Id*. (quoting

*Markman*, *supra*, 52 F.3d at 980).  I am free to consult a dictionary, however, "at any time . . .

when construing claim terms, so long as the dictionary definition does not contradict any

definition found in or ascertained by a reading of the patent documents."  *Vitronics*, *supra*, 90

F.3d at 1584 n.6.

## II. '832 PATENT

      The '832 patent involves a device for locking two objects with thick cross-sections

together—e.g., a trailer hitch to a motor vehicle.  For purposes of verbal explanation of what is

best described with dimensional representations, I use the trailer hitch example throughout this

order.  The device can be described as either a barbell-shaped device or a cable—enlarged, bent,

or looped at the nonlocking end so that the nonlocking end cannot pass through the bore hole or

other aperture space into which the device inserted—that can be passed on one end through both

a trailer hitch and a vehicle mount and then locked, thereby fastening the hitch to the vehicle.  The

'832 patent, in relevant part, is described in the claims as follows (construed terms underlined):

> 17.  A locking device, comprising: (a) <u>a key operable locking head</u> movable
> between a locked state and an unlocked state . . . said locking head including a <u>seal
> disposed proximately to the opening in surrounding relation thereto</u>; and (b) a
> <u>shackle member</u> including a latch portion configured for insertion into the locking
> head through the opening to define a mated state and configured to engage said
> locking head, . . . <u>said latch portion including a seal surface when said locking head
> is in the fastened state</u> thereby to prevent ingress of unwanted substances through
> the opening and into the interior of said housing.
>
> 18.  A locking device according to claim 17 wherein <u>said shackle member includes
> a linear portion that has an enlarged knob at a first end thereof with said latch
> portion disposed at a second end thereof opposite the first end.</u>

### A.  *"Key Operable Locking Head"*

The parties initially dispute the term "key operable locking head."  A review of the '832

patent clarifies the patented device consists of two distinct parts—a "locking head" and a "shackle

member."  The term "key operable locking head" means an assembly that can be affixed to the

latch portion of the shackle member—defined *infra*—with a key so that the insertable end of the

shackle member can no longer be removed from the bore hole or other aperture of the two

locked-together objects.  Although Plaintiff proposes a definition of "locking head" that requires

the locking head be removable from the shackle member when in an unlocked state, this additional

feature is not included in the '832 patent and accordingly is not part of the definition of "key

operable locking head."

B.   *"Said Shackle Member Includes a Linear Portion that has an Enlarged Knob at a First End Thereof with Said Latch Portion Disposed at a Second End Thereof Opposite the First End"*

The "shackle member" is that part of the patented device that is inserted into a bore hole or other aperture in both the trailer hitch and the vehicle mount—or other thick cross-section objects—thereby preventing the hitch from escaping the mount.  The shackle member is recited to include a "linear portion," a "stop portion," and a "latch portion."  The "linear portion" is inserted in and through the common aperture or bore hole between the trailer hitch and vehicle mount.  On one end—the end not inserted into the bore hole—the linear portion has an enlarged, bent, or looped portion—the "stop portion"—that cannot pass through the bore hole or other aperture of the trailer hitch and vehicle mount.  On the end inserted into the borehole, the linear portion is notched such that the locking head—which is also unable to pass through the hole—will attach securely to the shackle member once locked thereto.  This notched zone is called the "latch portion."

Claim 18 recites a shackle member that has a stop portion—composed of a knob of a diameter that is too large to pass through the borehole or other aperture of two locked-together objects—on one end of the linear portion and a latch portion at the other end of the linear portion.

C.   *"Seal Disposed Proximately to the Opening in Surrounding Relation Thereto"*

One component of the locking head of the '832 patent is identified as a "seal" which "prevents ingress of unwanted substances through the axial opening and into the interior of the housing."  The parties dispute whether the seal must necessarily be located within the locking head, or whether a seal that is located on the external receiving end of the locking head is also included in the definition.

6

Claim 17 confirms that the seal and the seal surface engage only "when said locking head is in the fastened state." As the portion of the shackle member that comprises the seal surface is entirely within the opening of the locking head when the locking head is in the fastened state, it follows that the seal itself must be fully within the locking head in order to make adequate contact with the shackle member sufficient to prevent the ingress of unwanted substances. Accordingly, the plain language of the patent reveals that the seal must be located within the locking head and must contact the shackle member when the shackle member and locking head are in the locked state.

D.   *"Said Latch Portion Including a Seal Surface when*
*Said Locking Head is in the Fastened State"*

The parties agree that this phrase should be defined such that the latch portion of the shackle member must include a surface area contacted by the seal portion of the locking head when the locking head and shackle member are in the fastened state.

**III. '115 PATENT**

In addition to the claims covered by the '832 patent, the '115 patent includes attachable sleeves of varying diameters designed to slide over the shackle member so that the shackle member will snugly fit into a variety of different sized bore holes or other apertures. The '115 patent specifically incorporates the contents of the '832 patent. Accordingly, the terms concurrent among the two patents are construed similarly. *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1329 (Fed. Cir. 2001). The term "locking head" in the '115 patent varies slightly from the term as construed in the '832 patent, however, in that the locking head in the '115 patent "is removable when unlocked," *see* ABSTRACT, and may be locked by any type

7

of locking mechanism, including a keyless lock, *see* col. 5, ll. 41–45.  In all other respects, the

disputed concurrent terms in the '115 patent are construed as in the '832 patent.

The sleeve portion of the locking device is described in Claim 1 as: "(e) <u>a sleeve</u>

<u>removably disposed and carried on said shank</u> when in an engaged position such that said shank

and said sleeve together define a size conversion structure having one operative thickness

dimension for insertion into one of said first and second apertures when said sleeve is in the

engaged position and another operative thickness dimension smaller than said one operative

thickness dimension for insertion into another of said first and second apertures when said sleeve

is removed from said shank; and (f) <u>a retaining member independent of said locking head</u> for

releasably securing said sleeve on said shank"  "Sleeve" normally means "an encasement into

which an object fits."  *See* WEBSTER'S II NEW COLLEGE DICTIONARY, at 1037 (1995).  The

parties do not dispute this meaning should apply here.  The plain meaning of the phrase "a sleeve

removably disposed and carried on said shank," therefore, means an encasing piece of material

that is capable of being slid on and off the "linear portion" of the shackle member.  Likewise, a

"retaining member independent of said locking head" is simply a structure or piece—not

permanently affixed to the locking head—that assists in keeping the sleeve on the shank.

## IV. '426 PATENT

The '426 patent is a method patent covering the method of providing an adjustable

diameter locking device described in the '115 patent.  Accordingly, the terms concurrent among

the two patents are construed similarly.  The method is described in Claim 1 as: "(a) providing a

sleeve with an inner diameter sized to closely fit over said shank in an engaged position with said

sleeve having an inner surrounding surface and a sleeve length sufficient to extend over a majority

of the length of said shank when in the engaged position with <u>the inner surrounding surface of</u> <u>said sleeve in substantially confronting relation with the outer surrounding surface of said shank</u> over substantially the length of said sleeve thereby to achieve a close-fitted mated engagement with said shank."  "Confronting" normally means "to come face to face with" or "to come up against."  *See* WEBSTER'S II NEW COLLEGE DICTIONARY, at 237.  The parties do not dispute this meaning should apply here.  Accordingly, "the inner surrounding surface of said sleeve in substantially confronting relation with the outer surrounding surface of said shank" means the inner surface of the sleeve, for the most part, faces the outer surface of the shank.

## V. '649 PATENT

Like the '832 patent, the '649 patent also involves a device for locking two objects with thick cross-sections together.  The '649 patent incorporates the '832 patent by reference.  Accordingly, except as discussed in this Part, the disputed terms in the '649 patent are construed as in the '832 patent.

The '649 patent differs from the '832 patent in that the locking head—and the stop portion of the shackle member—is entirely covered by a head cover.  The head cover may include a flange that forms a seal directly with the shackle member when engaged in a locking position or may be notched to accommodate a sealing o-ring.  Unlike the '832 patent, therefore, the '649 patent does not include the seal within the locking head, but rather external to the locking head.  Accordingly, the seal surface of the shackle member is not located entirely within the opening of the locking head when the locking head is in the fastened state, but instead makes contact with the head cover external to the locking head.  Additionally, the '649 patent does not require the

locking head be key actuated, but anticipates other types of locks—such as combination

locks—as well. *See* col. 3, ll. 31–32.

The '649 patent, in relevant part, is described in the claims as follows (construed terms

underlined):

> 1.  A locking device, comprising: . . . (B) a locking head including <u>a casing having a surrounding sidewall surface and a generally flat transverse inner head face</u> with an entryway sized and adapted to mate with said latch portion in a longitudinal axial direction and a locking mechanism disposed in said casing . . . and (C) a head cover including (1) a <u>cover portion</u> operative to engage the sidewall surface of said casing in surrounding relation thereto and extending therealong in the longitudinal axial direction so as to be secured thereto, and (2) a <u>flexible, resilient flange portion extending inwardly from said cover portion to define an opening having a surrounding flange edge that defines a seal structure</u>, the opening being sized such that said latch portion may be inserted into and removed from said locking head through the opening with said seal structure operative when said latch position is in the engaged state to sealably engage the outer surface margin of said shank portion.
>
> 15.  A locking hitch pin adapted to secure at least two members together, comprising: . . . (B) a <u>locking head formed either as a cylinder or a frustum</u> adapted to engage said shank to define an engaged state, said locking head having a <u>peripheral head surface</u>, a transversely oriented inner head face adjacent to said shank portion . . . and a transversely oriented outer head face opposite said inner head face . . . and (C) a head cover including (1) a cylindrical or frustoconical skirt operative to extend around the peripheral head surface . . . (2) a first flange extending inwardly from said skirt . . . and (3) a <u>seal structure associated with the edge of said first flange</u>, said seal structure operative when said latch portion is in the engaged state to seal against the outer surface margin of said shank portion.
>
> 33.  A locking hitch pin adapted to secure at least two members together, comprising: . . . (C) a head cover including (1) <u>a skirt operative to extend around and mechanically engage at least some of the peripheral head surface so as to engage said locking head.</u>

### A.  *"A Casing Having a Surrounding Sidewall Surface and a Generally Flat Transverse Inner Head Face"*

"Casing" normally means "an outer cover." *See* Webster's II New College

Dictionary, at 173.  The parties do not dispute this meaning should apply here.  A "sidewall" is

a wall forming the side of something and is distinguished by comparison to an endwall.

10

Accordingly, the "sidewall" in this instance is that portion of the casing that forms a tubular or frustoconical shape around the locking mechanism, but does not comprise the end portion of the casing on the side that receives the shackle member nor the end portion opposite the side that receives the shackle member.  "Transverse" normally means "situated or lying across."  *See* WEBSTER'S II NEW COLLEGE DICTIONARY, at 1172.  The parties do not dispute this meaning should apply here.  Claim 1 indicates that the that the "inner head face" means that end of the locking head that accepts the shackle member.  Accordingly, a "casing having a surrounding sidewall surface and a generally flat transverse inner head face" means an outer cover consisting of a tube with one end of the tube—the end that receives the shackle member—enclosed by a flat disc of material notched to accommodate the shackle member.

### B.  *"Cover Portion"*

Claim 1(C) requires that the locking head have a head cover with a "cover portion" and a "flange portion."  The "cover portion," as defined in the claim, includes only the portion of the head cover in contact with the sidewall of the casing.

### C.  *"Flexible, Resilient Flange Portion Extending Inwardly from Said Cover Portion to Define an Opening Having a Surrounding Flange Edge that Defines a Seal Structure"*

"Flexible" normally means "capable of being bent."  *See* WEBSTER'S II NEW COLLEGE DICTIONARY, at 427.  The parties do not dispute this meaning should apply here.  "Resilient" normally means "able to regain its original shape after being bent, stretched, or compressed."  *See* WEBSTER'S II NEW COLLEGE DICTIONARY, at 943.  The parties do not dispute this meaning should apply here.  Accordingly, a "flexible, resilient flange portion extending inwardly from said cover portion to define an opening having a surrounding flange edge that defines a seal structure"

means that portion of the head cover—which must be comprised of a bendable material that is capable of being able to regain its shape after being bent—that extends from the cover portion inward on the end of the locking head that receives the shackle member and is so shaped as to create a seal with the shackle member when the shackle member is inserted into the locking head.

### D. *"Locking Head Formed Either as a Cylinder or a Frustum"*

By the plain language of Claim 15, the locking head must be in the shape of either a cylinder or a frustum. "Cylinder" has a common definition meaning a tube shape with parallel sides and with flat ends of an elliptical shape. *See* WEBSTER'S II NEW COLLEGE DICTIONARY, at 282. The parties do not dispute this meaning should apply here. "Frustum" has a common meaning indicating a cone or a pyramid shape, but with the tip removed at an angle parallel to the base. *See* WEBSTER'S II NEW COLLEGE DICTIONARY, at 451. The parties do not dispute this meaning should apply here.

### E. *"Peripheral Head Surface"*

Claim 15(B) recites that the locking head has a "peripheral head surface." The claims and drawings indicate this is the same as the "surrounding sidewall surface."

### F. *"Seal Structure Associated with the Edge of Said First Flange"*

Claim 15(C) recites a head cover including (1) a "skirt" extending around the peripheral head surface; (2) a flange extending inwardly from the skirt on the end of the locking head that receives the shackle member, and that has an opening to accommodate the shackle member; and (3) a "seal structure associated with the edge of said first flange, said seal structure operative when said latch portion is in the engaged state to seal against the outer surface margin of said shank portion." The drawings indicate the seal structure is envisioned *both* as a separate structure

12

from the flange, *see* Fig. 11, and as part of the flange itself, *see* Fig. 7–10.  This interpretation is borne out by the specification as well.  *See* col. 7, ll. 7–33.  Although Defendant argues the term "associated with" has a meaning indicative of a separate structure, I find no ambiguity in the patent papers sufficient to require me to look beyond the intrinsic evidence.  *See Itel Corp. v. VIA Techs., Inc.,* 319 F.3d 1357, 1367 (Fed. Cir .2003) ("When an analysis of intrinsic evidence resolves any ambiguity in a disputed claim term, it is improper to rely on extrinsic evidence to contradict the meaning so ascertained."); *Vitronics*, *supra*, 90 F.3d at 1582.

### G.  "A Skirt Operative to Extend Around and Mechanically Engage at Least Some of the Peripheral Head Surface so as to Engage Said Locking Head"

The specification of the '649 patent states that the "skirt . . . substantially encases locking head" and that a "flange portion extends inwardly from cover portion or skirt to define an opening having a surrounding flange edge."  *See* col. 6, ll. 48–55.  Claim 33 indicates the skirt must "extend around and mechanically engage at least some of the peripheral head surface" and that the sealing flange "entend[s] inwardly from said skirt portion."  The "skirt," therefore, is that part of the cover portion that engages the peripheral head surface but does not comprise the flange.

## VI.  CONCLUSION

Accordingly, I make the following determinations of claim definition:

1)  In U.S. Patent No. 6,055,832, the term "key operable locking head" is defined as an assembly that can be affixed to the notched end of a shackle member with a key so that the insertable end of the shackle member can no longer be removed from the bore hole or other aperture of two locked-together objects.  The locking head need not be removable from the shackle member when in an unlocked state.

2) In U.S. Patent No. 6,055,832, the phrase "said shackle member includes a linear portion that has an enlarged knob at a first end thereof with said latch portion disposed at a second end thereof opposite the first end" means the shackle member—defined as the part of the patented device that is inserted into and through the bore hole or other aperture of two thick cross-sectioned objects for the purposes of locking them to one another when the locking head is attached—is comprised of a linear portion—defined as that part of the shackle member that passes through the borehole or other aperture—with a knob affixed at one end that is of a diameter that is too large to pass through the borehole or other aperture and a latch portion—defined as that part of the shackle member that is notched so that the locking head will attached securely to the shackle member once locked thereto—at the other end.

3) In U.S. Patent No. 6,055,832, the term "seal disposed proximately to the opening in surrounding relation thereto" means a seal located within the locking head that contacts the shackle member to form a surrounding seal when the shackle member and locking head are in a locked state.

4) In U.S. Patent No. 6,055,832, the term "said latch portion including a seal surface when said locking head is in the fastened state" means that the latch portion of the shackle member must include a surface area contacted by the seal portion of the locking head when the locking head and shackle member are in the fastened state.

5) In U.S. Patent No. 6,672,115, the term "locking head" is defined as in U.S. Patent No. 6,055,832, except that the locking head is removable when unlocked and may be locked by any type of locking mechanism, including a keyless lock.

14

6)  In U.S. Patent No. 6,672,115, the term "a sleeve removably disposed and carried on said shank" is defined as an encasing piece of material that is capable of being slid on and off the "linear portion" of the shackle member.

7)  In U.S. Patent No. 6,672,115, the term "a retaining member independent of said locking head" means a structure that assists in keeping the sleeve on the shank, but that is not permanently affixed to the locking head.

8)  In U.S. Patent No. 7,165,426, the phrase "the inner surrounding surface of said sleeve in substantially confronting relation with the outer surrounding surface of said shank" means the inner surface of the sleeve, for the most part, faces the outer surface of the shank.

9)  In U.S. Patent No. 7,225,649, the term "a casing having a surrounding sidewall surface and a generally flat transverse inner head face" is defined as an outer cover consisting of a tube with one end of the tube—the end that receives that shackle member—enclosed by a flat disc of material notched to accommodate the shackle member.

10)  In U.S. Patent No. 7,225,649, the term "cover portion" is defined as the portion of the head cover in contact with the sidewall of the casing.

11)  In U.S. Patent No. 7,225,649, the phrase "flexible, resilient flange portion extending inwardly from said cover portion to define an opening having a surrounding flange edge that defines a seal structure" means that portion of the head cover—which must be comprised of a bendable material that it capable of being able to regain its shape after being bent—that extends from the cover portion inward on the end of the locking head that receives the shackle member and is so shaped as to create a seal with the shackle member when the shackle member is inserted into the locking head.

12) In U.S. Patent No. 7,225,649, the phrase "locking head formed either as a cylinder or a frustum" means a locking head either in the form of a tube shape with parallel sides and flat ends of an elliptical shape or a locking head in the form of a cone or pyramid shape, but with the tip removed at an angle parallel to the base of such cone or pyramid.

13) In U.S. Patent No. 7,225,649, the term "peripheral head surface" is defined as that portion of the casing that forms a tubular or frustoconical shape around the locking mechanism, but does not comprise the end portion of the casing on the side that receives the shackle member nor the end portion opposite the side that receives the shackle member

14) In U.S. Patent No. 7,225,649, the term "seal structure associated with the edge of said first flange" means a seal that is part of the flange itself and/or a seal that comprises a separate piece from the flange, but that is integrated with the flange.

15) In U.S. Patent No. 7,225,649, the term "a skirt operative to extend around and mechanically engage at least some of the peripheral head surface so as to engage said locking head" means that part of the "cover portion" that engages the "peripheral head" surface but does not comprise the flange.

Dated: February   11  , 2008.

BY THE COURT:

     s/Lewis T. Babcock
Lewis T. Babcock, Judge

16