## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 06-cv-00619-LTB

PHILIP W. WYERS, a Colorado resident, and
WYERS PRODUCTS GROUP, INC., a Colorado corporation,
      Plaintiff,

v.

MASTER LOCK COMPANY, a Delaware corporation,
      Defendant.

---

## DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION
## FOR PARTIAL SUMMARY JUDGMENT OF
## NON-INFRINGEMENT AND INVALIDITY

---

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

SUMMARY OF ARGUMENT ........................................................................... 2

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................... 6

ARGUMENT ...................................................................................................... 9

    I.    Governing Law .................................................................................. 9

          A.    Summary Judgment ................................................................. 9

          B.    Non-Infringement ................................................................. 10

          C.    Anticipation and Obviousness .............................................. 10

          D.    On-Sale Bar.......................................................................... 13

          E.    Prior Inventorship ................................................................ 15

    II.    Master Lock Does not Infringe the '832 Patent................................ 16

    III.    The Asserted Claims of the '832 Patent are Invalid as Anticipated and Obvious, and By Operation of the On-Sale Bar. ................................ 17

          A.    Claim 17 is Anticipated, and Claim 18 is Obvious, in Light of the Undisputed Prior Art................................................. 18

          B.    The Asserted Claims of the '832 Patent are Invalid Due to the On-Sale Bar.............................................................................. 23

    IV.    The Asserted Claims of the '115 and '426 Patents are Invalid as Obvious and by Operation of the On-Sale Bar.................................. 24

          A.    The Asserted Claims of the '115 and '416 Patents are Invalid as Obvious............................................................................... 24

          B.    The Asserted Claims of the '115 and 426 Patents are Invalid due to the On-Sale Bar.......................................................... 28

    V.    The Claims of the '649 Patent are Invalid as Obvious and Due to Master Lock's Prior Inventorship. ................................................................ 29

          A.    The Claims of the '649 Patent are Obvious........................... 29

          B.    The '649 Patent Claims are Invalid Because Master Lock Invented its External Seal Before Wyers Did....................................... 32

CONCLUSION.................................................................................................. 34

# TABLE OF AUTHORITIES

## CASES

*Anderson's Black Rock, Inc. v. Pavement Salvage Co.*,
    396 U.S. 57 (1969) ................................................................................................11

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .................................................................................................9

*Evans Cooling Sys., Inc. v. GMC*
    125 F.3d 1448 (1997) ............................................................................................14

*Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*,
    340 U.S. 147 (1950) ..............................................................................................11

*In re Caveney*,
    761 F.2d 671 .........................................................................................................14

*Johnston v. IVAC Corp.*,
    885 F.2d 1574 (Fed. Cir. 1989) ...............................................................................9

*KSR Int'l v. Teleflex*,
    127 S. Ct. 1727 (2007) .............................................................11, 12, 21, 28, 30

*Mahurkar v. C.R. Bard, Inc.*,
    79 F.3d 1572 (Fed. Cir. 1996.) .........................................................................33, 34

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) .................................................................................................9

*Mergenthaler v. Scudder*,
    11 App. D.C. 264 (D.C. Cir. 1897) .......................................................................15

*Mycogen Plant Sci., Inc., v. Monsanto Co.*,
    243 F.3d 1316 (Fed. Cir. 2001) .............................................................................15

*Pfaff v. Wells Electronics, Inc.*,
    525 U.S. 1094 (1998) ...................................................................................13, 14, 28

*Price v. Symsek*,
    988 F.2d 1187 (Fed. Cir. 1993) .............................................................................15

*Rockwell Int'l Corp. v. United States*,
    147 F.3d 1358 (Fed. Cir. 1998) .............................................................................11

*Sakraida v. AG Pro, Inc.*,
    425 U.S. 273 (1976)...................................................................................................12

*Special Devices, Inc. v. OEA, Inc.*,
    270 F.3d 1353 (Fed. Cir. 2001)..........................................................................13, 24

*Verve, LLC v. Crane Cams, Inc.*,
    311 F.3d 1116 (Fed. Cir. 2002)..........................................................................10, 20

*Zacharin v. United States*,
    213 F.3d 1366 ...........................................................................................................13

## STATUTES

35 U.S.C. § 102.......................................................................................3, 4, 5, 13, 20, 25

35 U.S.C. § 102(a) ...................................................................................................10

35 U.S.C. §102(b) ..............................................................................10, 13, 14, 23, 28, 29

35 U.S.C. § 102(g) .........................................................................................5, 15, 34

35 U.S.C. § 103.................................................................................................11, 12, 25

Fed. R. Civ. P. 36...................................................................................................23, 28

Fed. R. Civ. P. 56(c) .................................................................................................9

## *INTRODUCTION*

Master Lock's history of innovation in the lock industry has earned the company a reputation for high quality and ingenuity.  Wyers' lawsuit attempts to remove from the public domain lock features that Master Lock and other third parties knew and used long before Wyers' "invention" of the products and methods claimed by the patents in suit.  Wyers alleges infringement of four different patents, all of which claim elements and techniques well known in the prior art.  By this motion, Master Lock presents undisputed evidence that clearly and convincingly establishes the invalidity of the asserted patent claims as a matter of law.  Master Lock further provides undisputed evidence to demonstrate that its accused device does not infringe U.S. Patent No. 6,055,832.

That undisputed evidence reveals that Wyers withheld prior art from the United States Patent and Trademark Office ("PTO").  Wyers subsequently misled the PTO as to the scope and character of that art.  Moreover, the undisputed evidence establishes that Wyers invalidated three of his own patents by offering for sale products that embody the "inventions" claimed in those patents more than a year prior to their filing dates.  Finally, one of the patents Wyers accuses Master Lock of infringing actually covers an invention that Master Lock developed before Wyers did.  Thus Wyers' allegations seek to deprive Master Lock of the ability to capitalize on its own invention.  This the law does not allow.

The evidence set forth below is undisputed.  The scope and content of the prior art is well-defined by prior patents and other undisputed documentary evidence.  Wyers has not only failed to produce evidence capable of rebutting Master Lock's evidence, but also conceded material facts by failing to respond to (and thereby admitting) a number of Requests to Admit.  Wyers failed to answer Interrogatories about its own allegations regarding the '649 patent.

Wyers opted against expert reports despite its testimony and discovery responses that it would rely on expert testimony on the issues of infringement and damages.  No genuine issues of material fact exist.  This case is ripe for summary judgment.

The patents in suit, U.S. Patent Nos. 6,055,832 ("'832 Patent"); 6,672,115 ("'115 Patent"); 7,165,426 ("'426 Patent") and 7,225,649 ("'649 Patent") relate to locks with specific features. The '832 Patent, as construed by this Court, claims a seal located within the locking head.  The '649 Patent recites a flange seal in a cover outside the locking head.  The '115 Patent and the '426 Patent claim, respectively, a lock with a removable sleeve on the shank, and the "method" of using such a sleeve so as to allow the lock to be used on items with different sized apertures.

The Master Lock product at issue in the case is its Barbell lock, shown below:



The only seal on this product is the external cap, outside the locking head.

### SUMMARY OF ARGUMENT

With respect to the asserted claims of the **'832 Patent**, the undisputed evidence conclusively establishes that Master Lock cannot infringe because it lacks a seal located within

the locking head.  Moreover, the undisputed evidence clearly and convincingly establishes the following grounds for invalidity:

**Anticipation and Obviousness**.  The same internal o-ring seal claimed in claims 17 and 18 of the '832 Patent existed for years prior to Wyers' "invention" in a lock designed and sold by Sargent & Greenleaf as early as 1991.  The combined teachings of Figs. 2 and 9-12 of U.S. Patent No. 5,664,445 ("Chang Patent") teaches use of an o-ring on the shackle of a lock shaped like a barbell.  Claim 17 is anticipated by the Sargent & Greenleaf product alone, and Claim 18 is rendered obvious by the Sargent & Greenleaf product combined with the Chang Patent:



**PRIOR ART**                    **WYERS**

Chang (1996)
(Rendering combined
 from Figs. 2, 9-12, see p. 19)

Sargent & Greenleaf (1991)
(Costley Ex. B)

'832 patent
(Fig. 11)
Priority date:  Sept. 16,1997

The elements Wyers claimed as an invention in the '832 Patent existed in the lock industry for over a decade prior to Wyers' patent application.

**On-Sale Bar.**  More than one year before Wyers filed its application for the '832 Patent, Wyers ordered, and his supplier sold to Wyers, commercial quantities of the lock containing the internal o-ring seal as claimed in the '832 Patent.  This sale renders claims 17 and 18 of the '832 patent invalid under 35 U.S.C. § 102.

The **'115 and '426** patents claim a removable sleeve on the shackle of the lock that allows the shackle to fit through apertures of different sizes.  The asserted claims of both patents are invalid for two reasons:

**Obviousness.**  For decades prior to Wyers' purported "invention" of a size conversion sleeve, Master Lock itself sold a lock known as the 37D, which included a sleeve on the shackle designed "to fit different sized apertures," *i.e.,* for size conversion.

| PRIOR ART | | WYERS |
|---|---|---|



| **Chang (1996)**<br>(Rendering combined<br>from Figs. 2, 9-12) | **MLC 37D lock**<br>(on sale since the 1970's) | **'115 & '426 patents**<br>(As shown in Fig. 3 & locking<br>head (14) from Fig. 1)<br>Priority date:  Apr. 24, 2000 |

Wyers did not tell the United States Patent and Trademark Office ("PTO") about the 37D product when applying for the '115 patent. Wyers did disclose it during the pendency of the '426 patent application, but amazingly denied (1) that it was prior art; and (2) that the sleeve served a size conversion function.  Thus, the PTO never considered the most important piece of prior art when either of the patents were granted.[1]

**On-Sale Bar.**  Like the '832 Patent, the '115 and '426 Patents are invalid under 35 U.S.C. § 102 because Wyers offered for sale products incorporating the claimed size conversion sleeves more than a year before applying for the patents.  Undisputed evidence from Wyers' own

---

[1] Wyers' conduct in withholding the true scope of the 37D from the PTO also renders those patents unenforceable due to inequitable conduct, although that issue is not a subject of this motion.

files establishes that Wyers offered to sell the product to a major national retailer more than a year before the patents' application date of April 24, 2000.

The **'649 Patent** claims an external flange seal.  If the patent is broad enough to cover the Master Lock product, it is invalid for two reasons:

**Obviousness.**  External flange seals were well-known in the lock industry when Wyers filed its application for the '649 patent.  Mr. Wyers himself characterizes the patented seal (shown below) as "simple" and "not that complicated."  Indeed, Master Lock's accused product borrowed its own external seal from prior Master Lock products that had been around since at least as early as 1994.  Wyers' own '832 Patent combined with Master Lock's ProSeries lock render the '649 patent obvious:

**PRIOR ART**                                                                      **WYERS**





**'832 patent** (Fig. 11)
Priority date: Sept. 16, 1997

**MLC 6121 lock**
(top view of actual product and
rendering from MLC 1994 Price Book)

**'649 patent**
(As shown in Fig. 10 &
enlarged knob from Fig. 3)
Priority date:  Feb. 7, 2003

**Prior Inventorship.**  The '649 Patent has an effective filing date of February 7, 2003.  Eight months *earlier*, on June 22, 2002, Master Lock designed the product that Wyers now accuses of infringement.  Mr. Wyers himself admits that he has no evidence that he invented the device claimed in the '649 patent earlier than January, 2003.  Master Lock's undisputed prior inventorship renders the patent claims invalid under 35 U.S.C. § 102(g).

The undisputed evidence demonstrates that no genuine issue of material fact exists on the issue of invalidity. That evidence, which will be detailed below in connection with each patent, conclusively establishes that the asserted claims of every patent in suit are invalid as a matter of law. It follows that this Court should dismiss Wyers' Amended Complaint with prejudice.

## *STATEMENT OF UNDISPUTED MATERIAL FACTS*

**Undisputed Material Facts Regarding the '832 Patent**

1.      Claims 17 and 18 of the '832 Patent are in dispute. They recite, *inter alia*, a "seal disposed proximately to the opening of the locking head."

2.      This Court interpreted these claims to require a seal located within the locking head. (February 11, 2008 Order)

3.      Master Lock's accused device does not have a seal located within the locking head.

4.      The Chang reference, U.S. Patent No. 5,664,445, ("Chang patent" or "Chang") discloses an o-ring seal used on a barbell-shaped lock. (January 11, 2007 Costley Report, Ex. B(3)).

5.      The '832 patent states that the location of the seal in the housing rather than outside it on the shackle differentiates the invention from the Chang patent. '832 Patent Col. 2, lines 17-23. (Declaration of Katherine W. Schill, ("Schill Decl.") Ex. 1).

6.      Beginning in 1991, Sargent & Greenleaf sold a lock with an internal o-ring seal. (Costley Decl., Ex. A [January 11, 2007 Costley Report], Ex. B, p.1; Costley Decl., Ex. C). A barbell-shaped lock is simply a type of padlock. (Schill Decl., Ex. 2 [Wyers Dep.] p. 21, ll. 11-13).

7.     A lock designer would consider features of all known padlock shapes when designing a barbell lock.  (Schill Decl., Ex. 3 [Master Lock's Requests to Admit, Unanswered]).

8.     Wyers filed the application that matured into the '832 Patent on September 15, 1998, and claimed priority to a provisional application filed on September 16, 1997. (Schill Decl., Ex. 1. ['832 Patent] p. 1).

9.     Wyers disclosed his product with an internal o-ring seal to his supplier on May 30, 1996 and requested the supplier to make the product.  (Schill Decl., Ex. 2 [Wyers Dep., Ex. 11]; Schill Decl., Ex. 4 [Wyers Dep.] pp. 60, ll. 15-17).

10.     On June 11, 1996, the supplier offered to ship five sample products according to Wyers' internal o-ring design on June 12, 1996, to be followed by 3,000 production units on July 10, 1996.  (Schill Decl., Ex. 5 [Wyers Dep., Ex. 15]).  The June 11 letter also enclosed an invoice to Wyers for 3,000 units.  (Schill Decl., Ex. 6 [Wyers Dep. Ex. 16]).

**Undisputed Material Facts Regarding the '115 Patent and '426 Patent**

11.     The '115 Patent claims, in relevant part, a locking device having a shank and a sleeve slid onto the shank.  The locking device can be used either with or without the sleeve so that the effective outer diameter of the shank can be changed to accommodate insertion into different sized holes.  (Schill Decl., Ex. 7 ['115 Patent]).

12.     The '426 Patent claims a method of varying the diameter of the shank of a lock. This patent and the '115 Patent share the same specification.  (Schill Decl., Ex. 8. ['426 Patent]).

13.     Since the 1970s, Master Lock has sold a trailer hitch lock known as the 37D with a removable sleeve on the shackle.  (Declaration of Paul R. Peot ("Peot Decl.") ¶ 2, Ex. A).

14.     The PTO never considered the 37D when it examined and issued the '115 Patent.

15.     All the elements of the '115 and '426 patent claims at issue – except for the removable head – are present in the Master Lock 37D.  (Declaration of Brian Costley ("Costley Decl.") Ex. A [January 11, 2007 Costley Report] Ex. B(2); Costley Decl., Ex. B [November 6, 2007 Costley Report]).  The prior art, including Chang, had removable heads.  (January 11, 2007 Costley Report, Ex. B(3)).

16.     The '115 Patent was filed on April 24, 2000 and the '426 Patent claims priority to that same date.  (Schill Decl., Ex. 7 ['115 Patent], Ex. 8 ['426 Patent]).

17.     Wyers offered for sale the product embodying the claims of the '115 and '426 Patents prior to April 24, 1999.  (Schill Decl., Ex. 9. [Wyers Dep. Ex. 22] p. WPG1415-17).

**Undisputed Material Facts Regarding '649 Patent**

18.     The '649 Patent covers, *inter alia*, a lock with an external seal – as opposed to the internal seal of the '832 Patent.  Specifically, claim 1 recites a "flange edge that defines a seal structure" outside of the locking head.  (Schill Decl., Ex. 10 ['649 Patent], col. 8, ll. 34-47).

19.     Master Lock's own ProSeries 6121 product has used an external seal for decades to prevent the ingress of dirt and water.  (Peot Decl., ¶ 4, Ex. C).

20.     Prior art patents show locks with external seals.  Schill Decl., Ex. 11 [U.S. Patent No. 2,375,488]; Ex. 12 [U.S. Patent No. 4,226,100]; Ex. 13 [U.S. Patent No. 6,813,914]).

21.     Members of Master Lock's product development staff invented the external seal now accused of infringing the '649 Patent on *July 22, 2002*.  (Irgens Decl., ¶ 2, Ex. A; Peot Decl. Ex. D).

22.     Master Lock reduced the invention to practice by February 27, 2003.  (Irgens Decl., ¶ 6).

23.     Wyers did not file the '649 patent application until February 7, 2003.   (Schill Decl., Ex. 10 ['649 Patent]).

24.     Wyers has no evidence that he invented the external seal recited in the '649 patent before January, 2003.

25.     Wyers has no conception sketches of the flange seal concept that is the subject of the '649 patent prior to January, 2003.   (Schill Decl., Ex. 3 [Master Lock's Request to Admit No. 1, Unanswered]).

*ARGUMENT*

I.      **Governing Law**

A.      **Summary Judgment**

Summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).   No genuine issue of material fact exists "(w)here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party...."   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   "(A) complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial" and mandates the entry of judgment as a matter of law.   *Celotex*, 477 U.S. at 322-23.   Summary judgment remains as appropriate in a patent case as in any other.   *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1576-77 (Fed. Cir. 1989).

### B.     Non-Infringement

Courts analyze the issue of patent infringement using a two-step process.  First, the court construes the asserted claims to determine their scope and meaning.  *See, e.g., Markman,* 52 F.3d at 967; *see also Vitronics Corp.* v. *Conceptronic, Inc.,* 90 F.3d 1576, 1581-82 (Fed. Cir. 1996). This Court completed this first step in its Order dated February 11, 2008.  In the second step, one compares the properly construed claims to the accused product to determine whether all of the claim limitations are present in that device, either literally or by a substantial equivalent. *Renishaw PLC* v. *Marposs Societa' Per Azioni,* 158 F.3d 1243, 1247-48 (Fed. Cir. 1998). "[S]ummary judgment is appropriate when it is apparent that only one conclusion as to infringement could be reached by a reasonable jury."  *Telemac Cellular Corp.* v. *Topp Telecom, Inc.,* 247 F.3d 1316, 1323 (Fed. Cir. 2001).  If the undisputed evidence establishes that even one claim limitation is missing from an accused product, then the defendant is entitled to judgment of non-infringement as a matter of law.

### C.     Anticipation and Obviousness

A patent claim is invalid as anticipated if the claimed invention was "known or used by others in this country ... before the invention thereof by the applicant for patent," 35 U.S.C. § 102(a), or was "in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States," 35 U.S.C. § 102(b).  Invalidity based on anticipation flows from evidence that a single reference describes the claimed invention with sufficient precision and detail to establish that the subject matter existed in the prior art. *Verve, LLC v. Crane Cams, Inc.,* 311 F.3d 1116, 1120 (Fed. Cir. 2002).  Such evidence establishes that a purported invention is not, in fact, novel.

10

Patent claims are invalid as obvious when a combination of two or more prior art references contains the elements of those claims, and a motivation to combine the references exists. 35 U.S.C. § 103; *Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1365 (Fed. Cir. 1998). Recently, the United States Supreme Court substantially changed the analysis of the requisite motivation to combine, finding that the previous standards applied by the Court of Appeals for the Federal Circuit were too rigid. *KSR Int'l v. Teleflex* 127 S. Ct. 1727 (2007).

Prior to *KSR*, the Federal Circuit required a party asserting obviousness to establish a "teaching, suggestion or motivation" to combine known elements. These rigid standards, applied by the PTO when examining the patents in suit here, denied courts "recourse to common sense." *KSR*, 127 S. Ct. at 1742. The Supreme Court voiced concern that as applied, this test allowed a patentee to own a monopoly over nothing more than combinations of elements already found in the prior art. Specifically, the Court noted that a "patent for a combination which only unites old elements with no change in their respective functions…obviously withdraws what is already known into the field of its monopoly and diminishes the resources available to skillful men." *KSR* at 1739, citing *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 152 (1950). "This is a principal reason for declining to allow patents for what is obvious. The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.*

The Court further noted that "while the combination of old elements performed a useful function, it added nothing to the nature and quality of the [product] already patented." *KSR* at 1740, citing *Anderson's Black Rock, Inc. v. Pavement Salvage Co.,* 396 U.S. 57, 62 (1969). Additionally, the *KSR* court held that when a patent simply arranges old elements with each performing the same function it had been known to perform, "and yields no more than one would

expect from such an arrangement, the combination is obvious." *KSR* at 1740, citing *Sakraida v. AG Pro, Inc.,* 425 U.S. 273, 282 (1976).

From its own precedent, the *KSR* Court derived principles "instructive" for answering "the question . . . whether a patent claiming a combination of elements of prior art is obvious:"

- "When a work is available in one field of endeavor, design incentives and other market forces can prompt variation of it, either in the same field or a different one."

- "If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability."

- "For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill."

*Id.* at 1740.

The Court held that "[c]ommon sense teaches . . . that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." *Id.* at 1742. Moreover, the Court also cautioned that "[g]ranting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may, in the case of patents combining previously known elements, deprive prior inventions of their value or utility." *Id.* at 1740.

Application of the *KSR* principles to the patent claims in this case leads to the inescapable conclusion that all of the asserted claims in each of the four patents are obvious (except those that are anticipated), and thus invalid as a matter of law.

### D.       On-Sale Bar

Under 35 U.S.C. § 102(b), a patent is invalid if the "invention" recited was "on sale" more than one year before the patent application was filed.  *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 1094, (1998).  In *Pfaff*, the Supreme Court set forth a clear two part test to determine whether the statutory on-sale bar applies:  (1) the product must be the subject of a commercial offer for sale; and (2) the invention must be ready for patenting at the time of the offer.  525 U.S. at 68.  A "commercial offer for sale" for purposes of section 102 occurs when the "parties offer or agree to reach 'a contract … to give and pass rights of property for consideration, which the buyer pays or promises to pay the seller for the  thing bought or sold."  *Special Devices, Inc. v. OEA, Inc.*, 270 F.3d 1353, 1355 (Fed. Cir. 2001).  In *Special Devices*, the parties and the court agreed that the following three events constituted offers to sell under § 102: (1) patent holder sending a proposal for a supplier to manufacture half of patent holder's needs for the commercial embodiment; (2) the supplier accepting that proposal; and (3) the patent owner ordering units for delivery.  *Id.*

Although conceding that the foregoing actions each qualified as an offer for sale, the patent owner in *Special Devices* urged the court to recognize a "supplier exception" to the on-sale bar, such that an offer for sale involving a supplier would not implicate section 102.  The Federal Circuit flatly refused:

> First, the text of section 102(b) itself makes no room for a "supplier" exception, stating only that a "person shall be entitled to a patent unless ... the invention was ... on sale in this country, more than one year prior to the date of the application for patent in the United States."  By phrasing the statutory bar in the passive voice, Congress indicated that it does not matter who places the invention "on sale"; it only matters that someone--inventor, supplier or other third party--placed it on sale.  *See* 35 U.S.C. § 102(b); *see also Zacharin,* 213 F.3d at 1371, 55 USPQ2d at 1051 ("[U]nder this court's precedents, it is of no consequence that the sale was made by a third party, not by the inventor....").

> Consistent with this rationale, we have previously held that even if a thief "stole" the claimed invention and passed it on to an innocent buyer, the innocent buyer's subsequent offer to sell still triggered the plain language of the on-sale bar. *See Evans Cooling Sys., Inc.,* 125 F.3d at 1453-54, 44 USPQ2d at 1042 ("[W]e decline to create the suggested new exception to the 102(b) bar which has no basis in the language of the statute."). Further, we explained that patentees could still protect themselves in these circumstances by taking "'prompt action'" and filing a patent application within the one-year deadline. *Id.* at 1453 (quoting *Lorenz v. Colgate-Palmolive-Peet Co.,* 167 F.2d 423, 429-30 (3d Cir.1948)). Here, OEA could have protected itself in the same manner, as its contractual relationship with Coors certainly provided no obstacle to a timely patent application filing. *See id.; see also Caveney,* 761 F.2d at 676, 226 USPQ at 4 ("The mere fact that a product is delivered to a distributor does not exempt the transaction from 35 U.S.C. § 102(b).").

*Id.* at 1355-56

Thus, an offer to sell, whether it is from the patent owner to a potential customer, or from a supplier of the patent owner back to the patent owner, triggers the on-sale bar. Both situations exist in this case – the former for the '115 and '426 patent, the latter for the '832 patent.

The second prong of the *Pfaff* tests examines whether the invention is ready for patenting at the time of the offer for sale. This "condition may be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." 525 U.S. at 68. In this case, we have detailed drawings disclosing the "inventions" in question. These drawings establish that the invention was ready for patenting when offered for sale.

### E.    Prior Inventorship

Under 35 U.S.C. § 102(g), an invention is not patentable if "before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g). "[A] challenger … has two ways to prove that it was the prior inventor:  (1) it reduced its invention to practice first … or (2) it was the first party to conceive of the invention and then exercised reasonable diligence in reducing that invention to practice." *Mycogen Plant Sci., Inc., v. Monsanto Co.,* 243 F.3d 1316, 1332 (Fed. Cir. 2001).

So as to prevent mere swearing contests, the Federal Circuit requires that prior conception be supported by more than naked testimony of the prior inventor. The doctrine of corroboration requires some independent evidence. "[A]n inventor's testimony, standing alone, is insufficient to prove conception--some form of corroboration must be shown." *Price v. Symsek,* 988 F.2d 1187, 1195 (Fed. Cir. 1993). The same holds true for a patentee trying to establish a date of conception that is earlier than the patent application's filing date.  As quoted by the *Price* court:

> [C]onception by an inventor, for the purpose of establishing priority, can not be proved by his mere allegation nor by his unsupported testimony where there has been no disclosure to others or embodiment of the invention in some clearly perceptible form, such as drawings or model, with sufficient proof of identity in point of time.   For otherwise[,] such facile means of establishing priority of invention would, in many cases, offer great temptation to perjury, and would have the effect of virtually precluding the adverse party from the possibility of rebutting such evidence.   Hence it has been ruled in many cases that the mere unsupported evidence of the alleged inventor, on an issue of priority, as to ... conception and the time thereof, can not be received as sufficient proof of ... prior conception.

*Mergenthaler v. Scudder,* 11 App. D.C. 264, 278 (D.C. Cir. 1897).

In this case, the presumptive date of Wyers' conception of the device claimed in the '649 Patent is February 7, 2003. Wyers has no evidence corroborating a conception date prior to January, 2003. The undisputed evidence demonstrates that Master Lock conceived of the accused device in mid-2002, well before Wyers. Master Lock has not only the inventor's testimony, but also corroboration in the form of dated sketches and signed business records, which clearly and convincingly demonstrate that Master Lock's conception occurred before Wyers'. Master Lock diligently reduced its invention to practice within seven months. Thus the undisputed evidence establishes as a matter of law that the '649 patent claims – to the extent that they are deemed to cover the accused device – are invalid because Master Lock conceived of the invention first.

## II.    Master Lock Does not Infringe the '832 Patent.

This Court's decision compels judgment of non-infringement with respect to at least the '832 Patent. This Court has interpreted the '832 patent claims to require a seal located ***within*** the locking head. Master Lock's accused devices do not have such a seal

This Court has held that "the term 'seal disposed proximately to the opening in surrounding relation thereto' means a seal **located within the locking head** that contacts the shackle member to form a surrounding seal when the shackle member and locking head are in a locked state." February 11, 2008 Order, p. 14 (emphasis added). Master Lock designed its current trailer hitch locks with an exterior seal, modeled after seals it has used on boat locks for at least a decade. *See, e.g.,* Irgens Decl., Ex. A. As shown below, and in the exemplar provided to the Court with this motion, a rubber cap sits on a structure outside of the locking head. The seal forms between the shackle and this cap outside of the locking head.



Master Lock's product does not have a seal located within the locking head.  It follows that the product does not infringe the '832 patent as a matter of law.

**III.     The Asserted Claims of the '832 Patent are Invalid as Anticipated and Obvious, and By Operation of the On-Sale Bar.**

The '832 patent contains 25 claims. Most of them (1-16 and 20-25) are directed to a structure that prevents "relative rotation" between the shackle and the locking head.  Those claims are not at issue in this lawsuit because Master Lock's product lacks such a structure. (Wyers' Responses to Master Lock's Interrogatories).  Likewise, claim 19 is not at issue because the accused device does not have a shackle member with a "flexible cable portion".  Wyers accuses Master Lock of infringing claims 17 and 18, which recite a "locking head including a seal disposed proximately to the opening in surrounding relation thereto."  Figure 11 illustrates the claimed seal:



**'832 patent**
(Fig. 11)
Priority date:  Sept. 16, 1997

Claims 17-18 are invalid as a matter of law.

### A.   Claim 17 is Anticipated, and Claim 18 is Obvious, in Light of the Undisputed Prior Art.

Wyers did not invent the barbell lock.  Such locks were well known long before Wyers entered the industry.   (Costley Decl., Ex. A [January 11, 2007 Costley Report] Ex. B p.2). Wyers did not invent the concept of a seal, or an o-ring seal.  Indeed, the Chang reference, U.S. Patent No. 5,664,445, ("Chang patent" or "Chang") discloses an o-ring seal used on a trailer lock with either a bent pin (Fig. 11) or an enlarged knob (Figs. 9, 10) opposite the latch portion. (Costley Decl., Ex. A [January 11, 2007 Costley Report], Ex. B(3)).  The Chang rendering below shows the enlarged knob embodiment shown in Fig. 10, and the o-ring seal mounted on the shackle of Fig. 10 inserted into a cross sectional view of the locking head shown in Fig. 2.



Fig. 10

Fig. 12
(o-ring colored in
red for clarity)

Fig. 2

Wyers asserts that the location of his seal in the housing rather than outside it on the shackle differentiates his invention from the Chang patent and rendered his invention novel. (Schill Decl., Ex. 1 ['832 Patent] Col. 2, lines 17-23).  Wyers described purported "drawbacks" of placing the seal on the shackle as in Chang: "Due to the location of the seal on the end portion of the shackle, the seal is completely exposed. Since it is of larger diameter than the shank of the shackle, the slidable engagement of the shackle through aligned bores of two objects exposes the oversized diameter of the seal to attack by the rough edges or other sharp corners of the bores due to its oversized diameter. Thus the seal can be damaged due to the snagging or rubbing of the seal against the aligned holes." *Id.*

Unbeknownst to the PTO, however, the very internal o-ring seal claimed by Wyers had already been used in a prior art lock.  Beginning in 1991, Sargent & Greenleaf sold a lock with an internal o-ring – precisely the same seal claimed by Wyers.  (Costley Decl., Ex. A [January 11, 2007 Costley Report], Ex. B, pp. 1-3).



**Sargent & Greenleaf lock (1991)**

Contrary to Wyers' assertions in the patent application, moving the o-ring of Chang to an internal position was not, in fact, novel. Sargent & Greenleaf did it in 1991 – seven years before Wyers. Its own internal o-ring addressed the "drawbacks" and solved the problems Wyers later purported to solve. This undisputed prior art, not considered by the PTO, invalidates claims 17-18 of the '832 patent.

Exhibit B(1) of the January 11, 2007 Costley Opinion compares the elements of claim 17 to the Sargent & Greenleaf lock. Every element exists in the single prior art reference. *Id.* Accordingly, the Sargent & Greenleaf reference anticipates claim 17, rendering that claim invalid under 35 U.S.C. § 102. *See, e.g., Verve, LLC, supra.*

Claim 18 adds detail regarding the lock's shackle. Specifically, the claim requires all of the elements of claim 17, plus a "linear portion" in the shackle with an "enlarged knob" at one end and the latch portion at the opposite end. (Schill Decl., Ex. 1 ['832 Patent], col. 11, ll. 57-61). The Chang patent shows precisely this shackle configuration. One of ordinary skill in the art would readily use the internal o-ring taught by Sargent & Greenleaf in the configuration taught by Chang. (Costley Decl., Ex. A [January 11, 2007 Costley Opinion], Ex. B, p.2).



**PRIOR ART**                    **WYERS**

**Chang (1996)**
(Rendering combined
from Figs. 2, 9-12)

**Sargent & Greenleaf (1991)**
(Costley Ex. B)

**'832 patent**
(Fig. 11)
Priority date: Sept. 16,1997

Indeed, claim 18 is nothing more than moving Chang's o-ring to an internal position. The o-ring serves the same sealing function whether it is used inside or outside the locking head. As the United States Supreme Court has noted,

> If a technique has been used to improve one device, and a person of ordinary skill would recognize that it would improve similar devices the same way, using the technique is obvious unless its actual application is beyond his or her skill.

*KSR*, 127 S. Ct. at 1740.

The fact that Sargent & Greenleaf's lock bears a traditional u-shaped padlock shackle is of no moment. Wyers himself admits that a barbell-shaped lock is simply a type of padlock. (Schill Decl., Ex. 2 [Wyers Dep.] p. 22, ll. 11-13); *see also,* Costley Decl., Ex. A [January 11, 2007 Costley Opinion] Ex. B pp. 2-4. Additionally, the '832 patent does not limit itself to barbell-shaped locks. "Indeed, virtually ***any type of shackle configuration*** is within the scope of the present invention so long as it has the axially insertable latch portion which will mate with the locking head. Moreover, different locking head constructions are possible while still providing the seal in the locking head to prevent the ingress of unwanted substances." (Schill Decl., Ex. 1 ['832 Patent] Col. 9, lines 21-26).

Brian Costley, who has worked as a locksmith since 1972, provides the only expert testimony in this case. He confirms Wyers' admission and the patent's language:

> It is my opinion that one of skill in the art knowing of the S&G [Sargent & Greenleaf] Lock and any barbell lock would have found it trivial to combine an O-ring as on the S&G Lock with the shape of the Chang or another barbell patent if one needed to prevent ingress of moisture or dirt. Indeed, the Chang patent itself shows an O-ring on the shackle.
>
> It struck me upon reading the patent that Mr. Wyers was trying to get a patent on things that were already known and used in the lock industry. As I discuss below, lock makers look to historical methods of solving problems and incorporate the solutions learned in the past in many types of locks. If one is presented with the problem of keeping out moisture or dirt, a lock maker would look to other locks to see how they did it. The idea of using an O-ring in the housing was the exact answer to the problem found by Sargent and Greenleaf. . . .
>
> I also do not accept the view that a barbell or straight shackle lock presents any special problems in adopting features or solutions used in other padlocks. Lock makers, and consumers, know that the shackles of locks can take different shapes, and be of different sizes, for different applications. The fact that one takes a feature from a padlock of one shape and puts it onto a lock with a different shaped shackle does not mean that one has "invented" something.

(Costley Decl., Ex. A [January 11, 2007 Costley Report] Ex. B, pp. 2-3).

This expert opinion is not only unrebutted, but also now deemed admitted by Wyers. In November, 2007, Master Lock served Requests to Admit on Wyers, including the following:

> **REQUEST NO. 1:**  A lock designer would consider features of all known padlock shapes when designing a barbell lock.

(Schill Decl., Ex. 3 [Master Lock's Requests to Admit]).  The undisputed evidence demonstrates that claim 17 is anticipated by the Sargent & Greenleaf lock, and claim 18 is obvious in light of the Chang patent combined with Sargent & Greenleaf lock.  One of ordinary skill in the art would have known that the Sargent & Greenleaf internal seal could be used on a barbell-shaped lock – particularly in light of the presence of an o-ring seal in the Chang patent.

Wyers never answered the Requests to Admit – despite an Order from this Court requiring Wyers to respond to discovery. (Schill Decl., Ex. 15). Accordingly, the statement is conclusively established under Fed. R. Civ. P. Rule 36.

### B.     The Asserted Claims of the '832 Patent are Invalid Due to the On-Sale Bar.

As noted above, a patent claim is invalid if a product embodying the claim was sold by anyone more than one year before the patent's application date. 35 U.S.C. § 102(b). This rule, known as the "on-sale bar," invalidates claims 17-18 of the '832 Patent as a matter of law.

Wyers filed the application that matured into the '832 Patent on September 15, 1998, and claimed priority to a provisional application filed on September 16, 1997. (Schill Decl., Ex. 1 ['832 Patent] p. 1). Accordingly, if anyone had a lock with an internal o-ring for sale on September 15, 1996 or earlier, then the claims covering that seal are invalid.

The undisputed evidence establishes that Wyers disclosed his internal o-ring seal to Wyers' Taiwanese supplier on May 30, 1996 and requested the supplier to make the products.[2] (Schill Decl., Ex. 4 [Wyers Dep. Ex. 11]). Wyers' correspondence includes a drawing of a barbell shaped lock with a "small groove to help retain…rubber 'o'ring". *Id*.; *See also* Schill Decl., Ex. 2 [Wyers Dep.] p. 60, ll. 15-17] (Admitting Ex. 11 shows o-ring). On June 11, 1996, the supplier offered to ship five sample products according to Wyers' design on June 12, 1996, to be followed by 3,000 production units on July 10, 1996. (Schill Decl., Ex. 5 [Wyers Dep. Ex. 15]). The June 11 letter also enclosed an invoice to Wyers for 3,000 units. (Schill Decl., Ex. 6 [Wyers Dep. Ex. 16]). Accordingly, a Wyers lock product with an internal o-ring seal was offered for sale in June, 1996 – months before the "bar date" of September 16, 1996. The evidence from Wyers' own files invalidates his patent claims as a matter of law. *See, e.g.,*

---

[2] The supplier's name is deemed confidential, and does not affect the on-sale bar analysis.

*Special Devices, supra.* (Offer for sale by supplier to patentee constitutes offer for purposes of on-sale bar analysis.)

**IV.     The Asserted Claims of the '115 and '426 Patents are Invalid as Obvious and by Operation of the On-Sale Bar.**

**A.     The Asserted Claims of the '115 and '416 Patents are Invalid as Obvious.**

The '115 Patent claims, in relevant part, a locking device having a shank and a sleeve slid onto the shank. The locking device can be used either with or without the sleeve so that the effective outer diameter of the shank can be changed to accommodate insertion into different sized holes (*e.g.,* of a trailer hitch and hitch receiver).



**'115 & '426 patents**
(As shown in Fig. 3 & locking
head (14) from Fig. 1)
Priority date: Apr. 24, 2000

The only claims of the '115 Patent even arguably applicable to Master Lock's devices are Claims 1, 8, 15, 19-22, and 24-27. With respect to the '426 Patent, claims 1, 2 and 7 are in suit. (Schill Decl., Ex. 14 [Wyers' Supplementary Responses to Defendant's First Set of Interrogatories]). They cover a method for "varying the diameter of the linear shank to adapt the locking device to various size apertures," with steps including use of a "sleeve." (Schill Decl., Ex. 8 ['426 Patent]). These two patents cover essentially the same subject matter, *i.e.,* a sleeve on the shank of a lock's shackle for purposes of size conversion. The identified claims of both patents, however, are all invalid as a matter of law.

Master Lock agrees that the removable sleeve is, indeed, a clever idea – but Master Lock used such a sleeve on its own lock long prior to Wyers' alleged invention and the date of the patent applications.  Master Lock has sold a lock known as the 37D (shown below) with the type of sleeve now claimed in the '115 and '426 Patents, continuously since the early 1970s.  (Peot Decl.).  The 37D in conjunction with Chang, Wyers' own lock (on sale long before the filing date of the '115 patent), or any other prior art lock shaped like a barbell, show what is claimed in the '115 and '426 Patents and render the claims of both patents invalid.

| **PRIOR ART** | | **WYERS** |
|---|---|---|



**Chang (1996)**
(Rendering combined
from Figs. 2, 9-12)



**MLC 37D lock**
(on sale since the 1970's)



**'115 & '426 patents**
(As shown in Fig. 3 & locking
head (14) from Fig. 1)
Priority date:  Apr. 24, 2000

Wyers filed the application for the '115 patent on April 24, 2000.  The '426 Patent bears an application date of January 6, 2004, but claims priority to April 24, 2000.  Thus any lock products or publications known to the public prior to April 24, 1999 constitute prior art.  *See, e.g.,* 35 U.S.C. § 102, 103.  Master Lock's 37D plainly qualifies as prior art.  (Peot Decl.; invoices).  Every element of the claims at issue, except a removable locking head, is found in the 37D. (Costley Decl., Ex. A [January 11, 2007 Costley Report] Ex. B(3); Costley Decl., Ex. B [November 6, 2007 Costley Report]).

Master Lock advertises its 37D Lock as an armored trailer hitch lock for use with trailer hitches.  *See* Peot Decl. Ex. A.  The shackle sleeve is removable.  *Id.*  With the sleeve off, the

locks fits openings of 9/32 inches, or 7 millimeters. *Id.* With the sleeve on, the 37D fits openings of 1/2 inch or larger. *Id.*

The PTO never considered the 37D when it examined the '115 Patent. Had the examiner known of it, the '115 patent claims would not have issued. Moreover, Wyers' disingenuous presentation of the 37D during prosecution of the '426 Patent demonstrates that he understood the devastating nature of the prior art.

Master Lock expressly told Wyers of the existence of the 37D lock on March 9, 2004 – three months after the '426 application was filed – when Master Lock sent pictures of the lock, invoices showing sales from 1995, and information that the lock had been on sale since the 1970's in identical designs. (Schill Decl., Ex. 16) Master Lock also provided Wyers with two annotated photographs of the 37D lock. *Id.* The first showed the full lock and highlighted exterior features. The second showed the sleeve and the internal retaining member. *Id.*

Wyers did not disclose the 37D to the PTO until over a year later, and even then Wyers failed to provide a full, accurate disclosure. On May 26, 2005, Wyers denied that the 37D constituted prior art, asserting it was only "allegedly sold" in 1995. (Schill Decl., Ex. 17) Wyers withheld the invoices that conclusively establish the 1995 sales as well as the information that Master Lock had sold the 37D continuously since the 1970's. Rather than admit the prior art and attempt to argue around it (which Wyers knew would be futile), Wyers mislead the PTO by using the word "allegedly".

Moreover, Wyers submitted only the first photograph of the 37D – omitting the picture that reveals the retaining member. *Id.* This retaining member was exactly the type of structure recited in Claim 2 of the '426 patent. (Schill Decl., Ex. 8 ['426 Patent] Col. 11, ll. 39-43) ("the

step of resisting removal of said sleeve from said shank by providing a compressible resilient element…")).

To compound the error, Wyers later mischaracterized the sleeve of the 37D to the PTO as "intended to be used for added security and not for adaptability as is recited in the present application." (Schill Decl., Ex. 17).  This is self-evidently false based on the very information Wyers possessed.  The sleeve provides for adaptability.  (Peot Decl., ¶ 2, Exs. A, C).  Wyers hoodwinked the PTO into issuing the '426 Patent by hiding the prior art's true scope.

Master Lock's expert confirms the sale of the 37D for the purpose of varying the diameter of the shackle:

> The Master Lock 37D, which I personally sold in the lock shop I owned and operated from 1976 to 1987, incorporates such a removable sleeve.  When installed on the shackle, it is retained by a nylon retaining ring fitted into the groove formed into the upper end of the sleeve.  Friction between the ring and the shackle holds the sleeve in place.  The shackle diameter without the sleeve is approximately .284 inches (7.2 mm).  The shackle diameter with the sleeve installed is approximately .436 inches (11.1 mm), allowing the padlock to accommodate two shackle hole diameters and the device being secured.  As a retailer of Master Lock products, I recommended the 37D for trailer hitch applications and for securing spare tire racks mounted under pickup trucks.  Therefore, all the elements of the '115 patent claims at issue are present in the Master Lock 37D.
>
> The 37D was used for trailers, and the 37D uses a sleeve to selectively vary the thickness dimension of a shank, and performs the exact function as this claim.  Just as taking a seal from a padlock to a barbell lock is non-inventive and trivial, so would using a sleeve on a different shaped shank.  Indeed, given that Master Lock came up with a sleeve for the shackle of a trailer lock before Wyers did, it seems possible that Wyers copied Master Lock's solution to the question of how to selectively vary the thickness of a shank.

(Costley Decl., Ex. A [January 11, 2007 Costley Report], Ex. B. pp. 3-4).

Wyers has produced no evidence capable of rebutting this expert testimony.  Indeed, Wyers' failure to answer Master Lock's most recent Requests to Admit renders it conclusively

established that "The sleeve in the Master Lock 37D trailer hitch lock may be used to vary the diameter of the shackle."  (Schill Decl., Ex. 3 [Request to Admit No. 2]; Fed. R. Civ. P. 36).

The prior art, including the 37D and third party barbell-shaped locks, includes every limitation of the asserted claims '426 Patent.  (Costley Decl., Ex. B [November 6, 2007 Costley Report]).  Together, this art shows barbell-shaped locks and a lock with a removable size-conversion sleeve.  As pointed out by Mr. Costley, and as discussed with reference to the '832 patent, using a well known technique from a trailer lock of one shape (*i.e.*, the sleeve from the 37D) to improve a trailer lock of a different shape (*i.e.*, a barbell or bent-pin hitch lock) is obvious.  *See also*, *KSR, supra*.  Whether the head is connected or disconnected from the shackle member does not in any way affect the ability to slide a sleeve onto the shackle to vary its diameter.

## B.   The Asserted Claims of the '115 and 426 Patents are Invalid due to the On-Sale Bar.

Like the '832 Patent, the asserted claims of the '115 and '426 Patents are invalid because Wyers offered for sale, more than one year before the filing dates, products with removable sleeves for size conversion.  *See* 35 U.S.C. § 102(b).

The "bar date" for both patents is April 24, 1999 because the '115 Patent was filed on April 24, 2000 and the '426 Patent claims priority to that same date.  Accordingly, the patent claims reciting a removable sleeve are invalid if any sale or offer for sale of a product with such a sleeve occurred before April 24, 1999.  *See, e.g.,* 35 U.S.C. § 102(b); *Pfaff, supra.*

Wyers' files contain a letter dated April 23, 1999 to the automotive buyer for a major national retailer that reiterates an offer, ***made the previous week***, to sell the sleeved locks. Specifically, Wyers' letter states:  "It was a pleasure talking with you last week regarding the new **Convertible,** ***"One Size Fits All"***, locking hitch pin my company manufactures.  This

exciting new product eliminates the need for the retailer to stock two pins, the 5/8" and ½" pins, thus saving valuable retail space."   (Schill Decl., Ex. 9 [Wyers Dep. Ex. 22] p. WPG1415 (Emphasis in original)).   Enclosed with the letter were two pages of drawings showing Wyers' product, model no. TS32, with a removable stainless steel sleeve.   (*Id.* at WPG1416-1417).   The drawings specifically show how to remove the sleeve.

This letter confirms that Wyers offered to sell its convertible sleeve lock during the week before April 23, 1999 – ***before the bar date of April 24, 1999***.   Wyers has presented no evidence to rebut the existence of this offer.   It follows that all claims reciting a removable sleeve and a method of using such a sleeve are invalid under 35 U.S.C. § 102(b).

## V.   The Claims of the '649 Patent are Invalid as Obvious and Due to Master Lock's Prior Inventorship.

Wyers has left Master Lock in the dark regarding the bases for its claims of infringement of the '649 Patent.   It has failed to answer written discovery requesting the identification of specific patent claims allegedly infringed.   It has ignored an Order from this Court to answer such discovery.   (Schill Decl., Ex. 15).   It has opted against relying on an expert on the issue of infringement, though Mr. Wyers testified that the company ***would*** rely on experts for evidence on that topic.   (Schill Decl., Ex. 2 [Wyers Dep.], p. 155, ll. 9-14).

To the extent, however, the claims of the '649 Patent are deemed to cover Master Lock's product, those claims are invalid for obviousness and because Master Lock invented its product before Wyers invented the patented device.

### A.   The Claims of the '649 Patent are Obvious.

The '649 Patent covers, *inter alia*, a lock with an external seal – as opposed to the internal seal of the '832 Patent.   Specifically, claim 1 recites a "flange edge that defines a seal structure" outside of the locking head.   (Schill Decl. Ex. 10 ['649 Patent]).   Figure 7 from the

'649 Patent illustrates the external seal (88) which extends from the external cover portion (82) on the locking head:



Fig.7

The '649 Patent must be considered in light of several prior art references, including Wyers' own '832 Patent.   One of skill in the art, knowing of these references, would have considered it obvious to move the seal from inside the locking head as in the '832 patent to outside the locking head.   Indeed, Master Lock's own ProSeries product has used an external seal for years to prevent the ingress of dirt and water.   (Peot Decl. ¶ 5, Ex. D; Costley Decl. Ex. B [November 6, 2007 Costley Report] pp. 2-3).



| **PRIOR ART** | **WYERS** |
|---|---|
| '832 patent (Fig. 11)<br>Priority date: Sept. 16, 1997 | MLC 6121 lock<br>(top view of actual product and<br>rendering from MLC 1994 Price Book) | '649 patent<br>(As shown in Fig. 10 &<br>enlarged knob from Fig. 3)<br>Priority date: Feb. 7, 2003 |

Given the ProSeries and Wyers' '832 patent alone, one can readily conclude that use of an external seal like Master Lock's on a lock shaped like Wyers' '832 patent is obvious.  *See, e.g., KSR, supra.*  Mr. Wyers himself thought the idea "so simple" that he didn't need sketches.

(Schill Decl., Ex. 2 [Wyers Dep.] p. 105, ll. 13-14).  He admitted that the device covered by the '649 is "not that complicated." (*Id.,* p. 100, ll. 3-7).  Based on what had been done before in the lock industry, Wyers thought the '649 patent design just made sense.  "We already have the components and stuff.  I mean, it's just a readily available, efficient system." (*Id.*, p. 104, ll. 12-16).

Unrebutted expert testimony confirms the '649 Patent's obviousness:

In general, the concept of sealing a padlock or padlock-like device against infiltration of dust, dirt, and moisture by employing a pliable cover is several decades old, and a well known solution to a common problem. This is evidenced in the simple shackle seals described in Patent 2,375,488 (Olson), filed in 1942. Another version of this concept is the pliable padlock shackle and body seal system described in patent 4,226,100 (Hampton), filed in 1979. . . . .

. . . . From 1976 through 1987, I operated my own retail lock shop, in Goodyear, Arizona. My shop sold the Hampton padlock from the time it first became available to us through 1987.  [I]t used a pliable shackle cover, a pliable O-ring at each end of the shackle cover, and a body cover that protected the entire padlock body. This seal system did not allow for any exposed metal when the padlock was closed and secured. It should also be noted that the Hampton patent allows for three different methods of sealing the point where the legs of the shackle enter the padlock body.

Yet another seal system is claimed in patent 6,813,914 (Chen), filed in 2003. This patent provides for grommet-type shackle leg seals that are captured in the top section of the body cover. This is a seal-within-a-seal design. In other words, the shackle leg seals have been moved from outside the body cover to within the body cover, yet they are still O-ring or grommet-type compressible devices designed to seal the point where the shackle legs enter the lock case.

\* \* \*

The reason that all these seal designs seem similar is because they are similar methods of solving the problem of dust, dirt, and moisture infiltration into padlock mechanisms. There is nothing related to a weather resistant seal system that I find new or unique in patent 7,225,649 (Wyers). All the seal concepts claimed are logical, obvious adaptations of work already completed by others. The hitch lock is a simple adaptation of the padlock. In fact, it is essentially a subset of a padlock. It is reasonable and not at all inventive to copy or adapt a design used to solve a problem in one shape of locking device for application to another shape of locking device.

(Costley Decl., Ex. B [November 6, 2007 Costley Report] pp. 2-3).

The Court recently construed a "generally flat transverse inner head face" to mean a "flat disc of material that is notched to accommodate the shackle member." If Wyers contends that the prior art does not show a "transverse inner head face," he concedes non-infringement.  The aperture in Master Lock's accused design, (an un-notched round hole with no additional structure or material) is identical to the design of the aperture in the prior art ProSeries 6121 device.  If the prior art lacks the claimed inner head face, then so does the accused device.

**B.     The '649 Patent Claims are Invalid Because Master Lock Invented its External Seal Before Wyers Did.**

Master Lock began selling the allegedly infringing products in about 2004.  Prior to that time, Master Lock sold similarly-shaped products, with an internal o-ring.  Master Lock set out to design a new product "to offer improved sealing performance over the o-ring seal currently used in hitch pin locks" in 2002, (Irgens Decl., Ex. A) and began selling that redesigned product in 2004.

Members of Master Lock's product development staff invented the external seal now accused of infringing the '649 Patent on ***July 22, 2002***.  (Irgens Decl., ¶ 2, Ex. A; Peot Decl. Ex. D).  Sketches of the same date show the external seal, corroborating the date of conception. (Irgens Decl., ¶ 4, Ex. B; Peot Decl. ¶ 5, Ex. D).



The Idea Disclosure form, signed by all the Master Lock inventors, depicts CAD drawings of the new seal and distinguishes that seal from the internal o-ring:

> Because the retaining feature of the new seal design is external . . . assembly is simplified, and replacement of the seal is easier due to improved accessibility

(Irgens Decl., Ex. A, p. 3).  Master Lock diligently worked to reduce its invention to practice by February 27, 2003 and then commercialized it.  (*Id.*, ¶ 6).

Wyers did not file the '649 patent application until February 7, 2003.  That date is, therefore, the presumptive conception date of Wyers' invention.  *See, e.g., Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576-77 (Fed. Cir. 1996).  Wyers has no evidence that he invented the external seal recited in the '649 patent before January 2003, the date shown on drawings submitted with the February 2003 application.  (Schill Decl., Ex. 2 [Wyers Dep.], pp. 167 ll. 17-22; Ex. 18 [Wyers Dep. Ex. 28]; Ex. 4 [Master Lock's Request to Admit, No. 1 Unanswered]).  It is undisputed, therefore, that Master Lock invented its external seal first.

Once a challenger has presented a *prima facie* case of invalidity, like Master Lock has, the burden shifts to the patent owner to produce evidence of an invention date prior to that of the challenger. *Mahurkar*, 79 F.3d at 1576-77. Wyers, however, offers nothing but a mere allegation that he "conceived" of the flange seal at the same time he conceived of the o-ring. (Schill Decl., Ex. 2 [Wyers Dep.] pp. 35, 36, 46, 101). Notably, he asserted that his "invention" was so simple it did not even require a sketch. (*Id.,* p.105). This evidence is insufficient as a matter of law to establish an earlier date of conception. The patentee cannot meet its burden of production without corroboration of an asserted conception date. *Marhurkar,* 79 F.3d at 1577.

Master Lock established a *prima facie* case of invalidity based on the uncontroverted and corroborated evidence of its July 22, 2002 invention followed by diligent reduction to practice. Accordingly, the burden shifts to Wyers to establish an earlier invention date. Wyers admitted that he cannot corroborate an invention date earlier than the date of the drawings submitted with the February 7, 2003 application. It follows that Wyers cannot meet his burden of production and cannot survive Master Lock's challenge to the validity of the '649 Patent.

Master Lock's prior inventorship renders the claims of the '649 patent – to the extent they are deemed to cover Master's Lock's product – invalid as a matter of law 35 U.S.C. § 102(g).

### CONCLUSION

The patents claims Wyers asserts against Master Lock are all invalid. By this motion, Master Lock presents clear and convincing evidence, compelling the conclusion that every asserted claim is invalid for at least one – if not two – reasons. For the Court's convenience, the following chart summarizes the grounds for non-infringement and invalidity and the supporting evidence.

## '832 Non-Infringement

'832 Patent requires a seal within the locking head.  Accused devices have an external seal.

## Invalidity

| PATENT CLAIMS | BASIS FOR INVALIDITY | UNDISPUTED EVIDENCE |
|---|---|---|

### '832 Patent

| Claim 17 | Anticipation | Sargent & Greenleaf |
|---|---|---|



O-ring seal mounted in housing

| Claim 18 | Obviousness | Chang and Sargent & Greenleaf |
|---|---|---|



O-ring seal mounted on shackle

locking head

enlarged knob

shackle

**Chang (1996)**
(Rendering combined from Figs. 2, 9-12, see p.19)



shackle

O-ring seal mounted in housing

locking head

**Sargent & Greenleaf (1991)**
(Costley Ex. B)

| Claims 17 & 18 | On-Sale Bar | Offer for sale of commercial quantities prior to September 16, 1996. |
|---|---|---|

## '115 and '426 Patents

| All asserted claims | Obviousness | Wyers '832 and Master Lock 37D |
|---|---|---|



**'832 patent** (Fig. 11)
Priority date: Sept. 16, 1997



**MLC 37D lock**
(on sale since the 1970's)

| All asserted claims | On-Sale Bar | Offer to sell to national retailer before April 24, 1999. |
|---|---|---|

## '649 Patent

Asserted claims                    Obviousness                    Wyers '832 and Master Lock 6121



**'832 patent** (Fig. 11)
Priority date: Sept. 16, 1997



shackle
flange
seal
portion
locking head
cover

**MLC 6121 lock**
(top view of actual product and
rendering from MLC 1994 Price Book)

| All asserted claims | Prior Inventorship | Master Lock's June 22, 2002 Invention |
| --- | --- | --- |





Based on the foregoing, Master Lock respectfully requests that this Court enter an Order dismissing Wyers' Amended Complaint and declaring the asserted claims of the patents in suit invalid as a matter of law.

Dated: February 15, 2008       By:  s/ Christopher P. Beall

Christopher P. Beall
LEVINE SULLIVAN KOCH &
SCHULZ, L.L.P.
1888 Sherman Street
Suite 370
Denver, Colorado  80203
Telephone:  303.376.2400


Jonathan H. Margolies
Katherine W. Schill
MICHAEL BEST & FRIEDRICH LLP
100 East Wisconsin Avenue
Suite 3300
Milwaukee, WI 53202-4108
Telephone:  414.271.6560
Facsimile:   414.277.0656


Attorneys for Defendant
Master Lock Company

## CERTIFICATE OF SERVICE

I hereby certify that on this   15th   day of February, 2008, I electronically filed the foregoing **DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION  FOR PARTIAL SUMMARY JUDGMENT OF NON-INFRINGEMENT AND INVALIDITY**, with the Clerk of the Court using the ECF/CM electronic filing system, which will send an electronic copy of this filing to the following counsel of record:

Timothy J. Martin, Esq. (tmartin@martinhenson.com,)
Law Offices of Timothy J. Martin, P.C.
9250 West Fifth Avenue, Suite 200
Lakewood, Colorado  80226


I hereby further certify that on this   15th   day of February, 2008, I served a photocopy of the foregoing **DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION  FOR PARTIAL SUMMARY JUDGMENT OF NON-INFRINGEMENT AND INVALIDITY**, along with a copy of the documents to be filed under seal, via U.S. Mail, postage paid and addressed to the following counsel of record:

Timothy J. Martin, Esq.
Law Offices of Timothy J. Martin, P.C.
9250 West Fifth Avenue, Suite 200
Lakewood, Colorado  80226


s/ Marla D. Kelley