**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 06-cv-00619-LTB-MJW

PHILIP W. WYERS, a Colorado resident, and
WYERS PRODUCTS GROUP, INC., a Colorado corporation,

       Plaintiffs,

v.

MASTER LOCK COMPANY, a Delaware Corporation,

       Defendant.

---

**WYERS' RESPONSE TO DEFENDANT'S MOTION TO PRECLUDE AN
UNDISCLOSED AND SPECULATIVE REQUEST FOR ROYALTIES**

---

**COME NOW** Philip W. Wyers and Wyers Products Group, Inc. ("Wyers"), by and through counsel, HENSLEY KIM & HOLZER, LLC, hereby file its Response to Defendant's Motion to Preclude an Undisclosed and Speculative Request for Royalties. In support of this response, Wyers states as follows:

### A.   *Wyers Has the Right to Present Evidence of a Reasonable Royalty*

Master Lock requests that this court limit the royalty rate Wyers can recover to an amount in which they are comfortable. Nonetheless, what an infringer would prefer to pay is not the test for damages. *Rite-Hite,* 56 F.3d at 1555; *See also Georgia-Pacific v. United States Plywood Corp.,* 318 F.Supp. 1116 (S.D.N.Y. 1970), *modified and aff'd,* 446 F.2d 295 (2d Cir. 1971). In patent law, "the fact of infringement establishes the fact

of damage because the patentee's right to exclude has been violated." *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.,* 895 F.2d 1403, 1406 (Fed. Cir. 1990); *see also* 5 *Chisum on Patents* § 20.03[3], at 20-142 (1986). The patentee must then prove the amount of damages. *Id.* When a "'reasonable royalty' is the measure, the amount may again be considered a factual inference from the evidence, yet there is room for exercise of a common-sense estimation of what the evidence shows would be a 'reasonable' award." *Id.*

35 U.S.C. § 285 states that, upon a finding of infringement, "the court shall award the claimant damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer." This statute "obviates the need to show the fact of damage when infringement is admitted or proven..." *Lindemann,* 895 F.2d at 1407. Section 285 "is clear that expert testimony is not necessary to the award of damages, but rather 'may [be] receive[d] ... as an aid." 35 U.S.C. § 284 (2000); *Dow Chemical Company v. Mee Industries, Inc.,* 341 F.3d 1370, 1382 (Fed. Cir. 2003).

In this case, Wyers will testify regarding facts, circumstances and considerations that would guide him in a hypothetical negotiation with Master Lock. He will testify that it would be his preference to avoid licensing the '115 Convertible Shank and that he would be willing to license the '649 External Flange Seal only if he received a higher royalty rate. The reasons for this position were shared with Master Lock during the depositions and have been a matter of record for some time. *See* the Deposition of Phil Wyers, 197:18-199:14.

Mr. Wyers will testify that the '115 Convertible Shank was a pioneering piece of technology that was central to his company's success against larger competitors like Master Lock. He will testify that, to maintain a competitive advantage, he would not license this product after the patent issued. While there was a prior license, this license was for the '832 Internal Seal Patent, not the '115 Convertible Shank (which had not yet issued). Specifically, the licensing agreement dealt with litigation surrounding infringement of the '832 Internal Seal Patent.

In light of the market advantage that the '115 Convertible Shank product provided, Wyers' ability to capitalize on that market advantage if he could exclude others from its use, the subsequent success of the product in the marketplace as a result of this patented feature, the profit margins on this product, Mr. Wyers will testify that a reasonable royalty in this case would be 33% of the gross sales of infringing products, or half of Master Lock's 66% profit margin on infringing goods. *See* Plaintiffs' Trial Exhibits 69-76 (Master Lock's records reflecting sales and cost of goods sold). This is also just over half of Wyers' 61% profit margin. *See* Plaintiffs' Trial Exhibit 77 (financial records of Wyers).

**B.     The Evidence Will Show that Wyers' Request of 33% for a Royalty is Reasonable**

A court may determine a reasonable royalty based on "hypothetical negotiations between willing licensor and willing licensee." *Fromsom v. Western Litho Plate & Supply Co.,* 853 F.2d 1568, 1574 (Fed. Cir. 1988). It has been held that "a reasonable royalty determination for purposes of making a damages evaluation must relate to the time infringement occurred." *Applied Medical Resources Corp. v. United States Surgical*

3

*Corp.,* 435 F.3d 1356, 1361 (Fed. Cir. 2006). In *Applied Medical,* there had been a prior patent infringement litigation which resulted in a royalty. *Id.* A royalty analysis three years later, and in light of prior infringement, required a different analysis – one that considers this prior history. *Id.*

Under the circumstances of this case, a 33% royalty is not inappropriate. In *Mitutoyo Corp. v. Central Purchasing, LLC,* the court determined that a 29.2% royalty was reasonable in light of a prior contentious relationship between the parties, even though this amount constituted the plaintiff's entire profit margin. 449 F.3d 1284 (Fed. Cir. 2007). In *Smithkline Diagnostics, Inc. v. Helena Laboratories Corp.*, an award of a 25% royalty was upheld even in the face of prior license agreements of between 3% and 5% because it was clear that the plaintiff was an unwilling licensor at the time of the infringement. 926 F.2d 1161, 1167 (Fed. Cir.1991). The court also considered the fact that there was immediate commercial success, the product satisfied a long felt need for that technology, and that plaintiff intended to maintain its exclusivity of the technology by refusing to patent it. *Id.*

Courts have also considered the fact that a licensee had to put his or her patent at risk, engage in painful and time consuming litigation, and the fact that the patentee and infringer are competitors in the market. *See Fromsom v. Citiplate, Inc.*, 699 F.Supp. 398, 407 (E.D. New York 1988). In *Minco, Inc. v. Combustion Engineering, Inc.,* in awarding a 20% royalty rate, the court considered that the patentee and infringer competed head to head at the time of infringement, the market contained no non-infringing alternatives, the

defendant regarded the invention as a significant advance, and that the industry enjoyed a high rate of profit. 95 F.3d 1109, 1119 (Fed. Cir.1996).

In *Rite-Hite Corp. v. Kelley Co.,* the court awarded a royalty equal to approximately fifty percent of plaintiff's estimated lost profits per unit. 56 F.3d 1538, 1554 (Fed. Cir.1995). This is the same percentage requested by Wyers, as described in his deposition. *See* Wyers Depo. 197:18-199:14. In that case, such royalty was reasonable in the face of testimony that the inventor would be willing to grant a competitor a license to use the technology only if it received a royalty of no less than one-half of the per unit profits. *Id.* This particular patent was a 'pioneer' patent with manifest commercial success. *Id.* The court also considered the fact that the patentee had a policy of exploiting its own patents, and that it would have to forego a large profit by granting a license to the infringer, especially since the infringer was a strong competitor. *Id.* Thus, it was not unreasonable for an unwilling patentee to only license its product for one-half its expected lost profits and that such an amount was a reasonable royalty. *Id.*

The fact that an award of reasonable royalties was "based on and was a significant portion of the patentee's profits also does not make the award unreasonable." *Id.* There "is no rule that a royalty be no higher than the infringer's net profit margin." *Id.* (quoting *State Indus., Inc. v. Mor-Flo Indus., Inc.,* 883 F.2d 1573, 1580 (Fed. Cir.1989). The "'imposition on a patent owner who would not have licensed his invention for [a certain] royalty is a form of compulsory license, against the will and interest of the person wronged, in favor of the wrongdoer.'" *Rite-Hite,* 56 F.3d at 1555 (quoting *Del Mar Avionics, Inc. v. Quinton Instrument Co.,* 836 F.2d 1320, 1328 (Fed. Cir.1987). That the

5

parties may have "agreed to a lesser royalty is of little relevance, for to look only at that question would be to pretend that the infringement never happened; it would also make an election to infringe a handy means for competitors to impose a compulsory policy upon every patent owner." *Rite-Hite,* 56 F.3d at 1555. (quoting *TWM Mfg. Co. v. Dura Corp.,* 789 F.2d 895, 900 (Fed. Cir.1986).

Phil Wyers will testify that, at the time Master Lock commenced its infringement of the '115 Convertible Shank patent and the '426 Convertible Shank Method patent in January, 2004, it was not a willing licensor. Mr. Wyers will testify that the nature of the commercial relationship between Wyers and Master Lock was that of business competitors in the same territory with the same products. It had previously engaged in contentious litigation and otherwise did not intend to license its products to Master Lock.

Wyers regarded the '115 and '426 technology as highly revolutionary. This was the key to Wyers' success in a market dominated by big players such as Master Lock. Mr. Wyers knew that if Wyers licensed these products to Master Lock, Master Lock would deploy its huge sales force to penetrate the vast majority of retailers, eviscerating Wyers' opportunity to sell to these same retailers and thus capture those profits. At that time, Wyers would only license the product if it could recoup a significant portion of the profits it would anticipate loosing to Master Lock. Further, there was no non-infringing alternative to this product.[1] Therefore, the product would likely yield a high level of success in the marketplace.

---

[1] Master Lock's only witness that will testify to non-infringing substitutes is its accountant, Mr. Thomas, who is not one of ordinary skill in the art of locksmithing and has no personal knowledge of these products.

6

Master Lock points to Mr. Wyers' signature to a licensing agreement in January of 2003 as evidence that Wyers would license the '115 Convertible Shank and '426 Method Patents. As one of these patents had not been filed and the other would not issue for another year, this argument by Master Lock is without merit. Certainly Master Lock's witness, Mr. Paul Peot, will testify that Master Lock is not in the business of paying royalties on un-patented technology. This licensing agreement was executed after a patent infringement suit relative to Master Lock's use of the '832 Internal Seal Patent. The '115 Convertible Shank or the '426 Method Patent were not referenced in that lawsuit. Mr. Wyers will testify that this technology was not discussed during the negotiations and the pictures that are attached to the agreement are meant to depict all the internal-sealed "Barbell Locks" that are covered by the patent in suit. At best, this argument by Master Lock is food for cross examination rather than a basis for preclusion of Mr. Wyers' honest testimony regarding the position he would have taken in January of 2004 in a hypothetical negotiation with Master Lock, a known infringer and major competitor.

There are additional factors that support a higher royalty. The sleeved and external flange sealed devices had the effect of promoting sales of other Wyers products. Thus, there was a high likelihood of convoyed sales. Because the patent was issued recently, it would not expire for a number of years. The sleeved products had major commercial success, as is demonstrated by Master Lock's massive sales and its prominence in the market. Further, these inventions have a high utility. Mr. Wyers will testify to this utility, which includes the ability to accommodate multiple trailer hitches

7

and hitch receivers. This is a major benefit not only to the retailer, but also the end use customer. Master Lock has sold tens of millions of dollars worth of this product, at a high gross margin. This profitability lends itself to a higher royalty. This is especially true since Master Lock, if it had a license, would capture the majority of the market, thus eliminating those profits for Wyers.

### C.    *Wyers' Reasonable Royalty Request is Consistent with his Deposition Testimony.*

Wyers' request for a 33% royalty represents approximately half of Master Lock's profit and just over half of Wyers' profit. *See* Plaintiffs' Trial Exhibits 69-76 (Master Lock's records reflecting sales and cost of goods sold); Plaintiffs' Trial Exhibit 77 (financial records of Wyers). Defendant refers to Wyers' deposition testimony regarding a $1.10 royalty, which is half of Wyers' profit on the device in question. *See* Motion, P. 4. In its Motion, however, Master Lock conspicuously omits Wyers' testimony wherein he describes his royalty calculation. When asked to calculate a royalty (based upon a different product), Mr. Wyers calculated his profit margin, then reduced it by half. In particular, Mr. Wyers testified as follows:

> Q. Okay. What work have you done since your deposition to analyze damages in this case?
>
> A. Well, I mean, I just calculated – took our history as far as when we started selling the Master Lock, took that number of what we – what our costs were, what they paid for it, and kind of extrapolated that as a damage number or a royalty.
>
> Q. Okay. Oh, and – so that would be the amount Master Lock has been paying you under the old settlement agreement?

> A. No.
>
> Q. Okay.
>
> A. This is back to the beginning, you know, of saying everything's equal. When they contacted me to buy product, I had my cost of what the product cost, what I sold it to them for, and the difference there being construed as either a royalty or however you want to look at it.
>
> Q. Okay.
>
> A. I mean, I guess if they were – probably a royalty, I guess.
>
> Q. What was the time period of this?
>
> A. '99 and 2000.
>
> Q. Okay.
>
> A. Possibly 2001.
>
> Q. And what were your costs?
>
> A. At the time, my landed costs were about $3.15 a unit.
>
> Q. And what was Master Lock paying?
>
> A. They were paying $5.35 a unit.
>
> Q. Okay.
>
> A. So the net would be about $2.20.
>
> \* \* \*
>
> A. ... You know, maybe it would be, I think, more than generous if you cut it in half.

Wyers Depo., 197:18-199:14. It is clear from Mr. Wyers' testimony that he was calculating his royalties to be half of his net revenue, which is the same figure provided to Master Lock prior to trial.

9

While counsel for Master Lock did not ask Mr. Wyers to calculate a reasonable royalty for either the '115, '426 or the '649 patents, he nonetheless shared his theory of a reasonable royalty rate, as outlined above. *See generally,* Wyers Depo., 197:18-199:14. Wyers now follows the same methodology articulated by Mr. Wyers in his deposition. *See* Wyers Depo, 198:5-199:14.

WHEREFORE, Philip Wyers and Wyers Products Group, Inc. respectfully requests that this Court deny Defendant's Motion to Preclude an Undisclosed and Speculative Request for Royalties.

DATED this 3rd day of March, 2009.

By:   *s/Michael P. Dulin*
Michael P. Dulin
Aaron P. Bradford
William T. Slamkowski
Thomas J. Osborne, Jr.
HENSLEY KIM & HOLZER, LLC
1660 Lincoln St., Suite 3000
Denver, CO  80264
Ph: 720-377-0770
Fax:  720-377-0777
*Attorneys for Plaintiffs Philip W. Wyers and Wyers Products Group, Inc.*

## CERTIFICATE OF SERVICE

I certify that on this 3rd day of March, 2009, a true and correct copy of **WYERS' RESPONSE TO DEFENDANT'S MOTION TO PRECLUDE AN UNDISCLOSED AND SPECULATIVE REQUEST FOR ROYALTIES** was served via ECF addressed to the following:

Jonathan H. Margolies
Katherine W. Schill
Michael Best & Friedrich, LLP
100 E. Wisconsin Ave., Ste. 3300
Milwaukee, WI 53202
*Attorneys for Defendant*

Christopher P. Beall
Levin Sullivan Koch & Schulz, L.L.P.
1888 Sherman St., Ste. 370
Denver, CO 80203
*Attorneys for Defendant*

*s/Michael P. Dulin*